THE STATE, JOHN KENNY, RELATOR, PLAINTIFF IN ERROR, v. ROBERT S. HUDSPETH, DEFENDANT IN ERROR.

1. If final judgment be rendered on a demurrer to an alternative writ of *mandamus*, a writ of error will lie.

2. Under the constitution of this state, as construed in the light of the uniform and long-continued practice of all the departments of the government, the legislature has power to reduce the number of the judges of the Court of Common Pleas whenever, in its opinion, the public good requires.

On error to the Supreme Court. For opinion of Supreme Court, see *ante p.* 320.

For the plaintiff in error, *Allan L. McDermott* (with whom was *Chauncy H. Beasley*).

The powers of the Courts of Common Pleas should be exercised by judges whose official lives are not dependent upon legislative caprice.

The right of the relator to the mandate of this court is dependent upon the success of his contention that chapter 102 of the laws of 1896 is unconstitutional.

In considering the letter and spirit of our state constitution, it may not be without benefit to dwell for a moment on

the wisdom of those whose words guided or applauded the
determination that, under our form of government, the judi-
cial should not be subservient to the legislative or executive
departments. New Jersey history relates an incident of which
the framers of the constitution of 1844 could not have been
unmindful. Josiah Hardy was appointed governor of New
Jersey in 1761. He served two years. The crown having
decided that every American judge should hold office at the
royal pleasure, Governor Hardy violated his instructions by
issuing commissions to judges during good behavior, and
was promptly dismissed. 2 *Banc. Hist. U. S.* 557.

Article 4, section 7, paragraph 10, provides that "the legis-
lature may vest in Circuit Courts or Courts of Common Pleas
within the several counties of this state, chancery powers, so
far as relates to the foreclosure of mortgages and sales of
mortgaged premises."

Article 5, section 1, of the state constitution deals with the
investiture of judicial power, and places it in, among others,
"such inferior courts as now exist and as may hereafter be
ordained and established by law, which inferior courts the
legislature may alter or abolish as the public good shall
require."

Section 6 provides (1) that "there shall be no more than
five judges of the Court of Common Pleas in each county of
this state after the terms of the judges of said court now in
office shall terminate; one judge for each county shall be
appointed every year, and no more, except to fill vacancies
for the unexpired term only; (2) that the commissions for the
first appointments of judges of said court shall bear date and
take effect on the 1st day of April next, and all subsequent
commissions for judges of said court shall bear date and take
effect on the 1st day of April in every successive year, except
commissions to fill vacancies, which shall bear date and take
effect when issued.

Article 7, section 2, provides (1) that judges of the Inferior
Court of Common Pleas shall be nominated by the governor
and appointed by him, with the advice and consent of the

senate ; (2) that they shall hold their offices for five years, but when appointed to fill vacancies they shall hold for the unexpired term only.

It is quite evident that there is irreconcilable conflict between these provisions if the first section of article 6 vests in the legislature absolute power to alter or abolish the Court of Common Pleas, and if that power is not finally settled in this tribunal, it may be well to recall the proceedings which led to the conflict of provision.

When the inquiry is directed to ascertaining the mischief designed to be remedied or the purpose sought to be accomplished by a particular provision, it may be proper to examine the proceedings of the convention which framed the instrument.    *Cooley Const. Lim.* 80, and cases cited.

The judiciary committee of the convention of 1844 was composed of Messrs. Van Arsdale, Green, Allen, Ogden, Randolph, Cassedy and Schenck.    Two of the defects in the then judicial system which received the attention of this committee were the wholly unnecessary number of judges of the Courts of Common Pleas and the fact that the administration of law by these judges holding, *ex officio*, the Orphans' Courts, was the subject of general complaint.

The report of the judiciary committee was made by Mr. Van Arsdale, and provided :

1. That the judicial power of this state shall be vested in a Court of Errors and Appeals in the last resort in all causes, as heretofore; a Court for the Trial of Impeachments ; a Court of Chancery; a Prerogative Court; a Supreme Court, and such other courts as now exist and as may be ordained and established by the legislature.

6. One of the justices of the Supreme Court, for the time being, shall be one of the judges of the Orphans' Court now existing in and for the several counties of the state.    In all cases except every regular term of the said Orphans' Court, when no Circuit Court is held in the county, such Orphans' Court may be held without a justice of the Supreme Court, but nothing in this article contained shall at any time here-

after abridge or restrain the power of the legislature to alter, change or annul the same, and ordain otherwise, as the public interest may require.

7. There shall be not less than three nor more than seven judges of the Inferior Court of Common Pleas in and for each of the several counties of this state.

This provision shall take effect in each county when the number of said judges now in office in said county shall not exceed seven.

The following substitutes were reported by Mr. Randolph for sections 6 and 7:

"Article 6. The Orphans' Court and the Court of Oyer and Terminer and General Jail Delivery, in each county of the state, shall be held by one of the justices of the Supreme Court and the judges of the Inferior Court of Common Pleas appointed under this constitution, or by any three of them.

"Article 7. From amongst the judges of the Inferior Courts of Common Pleas now holding commissions in the respective counties of the state, five shall be selected and appointed to be judges of said court under this constitution; and after the commissions of the judges now in office shall expire, there shall be but five judges of said courts. The judges of the said courts shall be appointed for the term of five years, and at the first term thereof held in the respective counties, they shall arrange themselves in such manner that the seat of one of them shall be vacated every year, in order that one judge may be annually appointed or reappointed. The legislature may, at any time hereafter, increase or lessen the number of the associate justices of the Supreme Court or change the mode of terms or places of holding the same. The mode of appointing the six judges of the Court of Appeals may be changed and their number increased so that they shall never exceed in number the justices of the Supreme Court and the Chancellor. The legislature may also abolish or otherwise alter any of the courts of the state except those specified in the first article, but the number of judges of the Inferior Court

of Common Pleas and of justices of the peace in the respect-
ive counties and townships shall never be increased."

It will be seen that the report of the majority provided for
a minimum number of judges of the Court of Common Pleas
and did not provide for legislative interference with the exist-
ence of the court.

On June 5th the reports were taken up by the convention,
and a debate commenced which led to the adoption of article
6, section 6, as we now find it in the constitution, the section
so numbered in both reports being rejected.

Mr. Randolph's section 6 was lost, and a motion by Mr.
Kennedy that the Orphans' Court be left as before was
adopted.   Mr. Randolph then offered his substitute for sec-
tion 7 of the majority report.

" Mr. Browning offered an amendment that there shall be
no more than five judges in each county after the commissions
of the present ones shall terminate.   One shall be appointed
in each year, the commission to date on the 1st of April, ex-
cept in case of vacancy, which shall be only for the unexpired
term, and commission to bear date when issued.

" Mr. Browning explained that it was based on this idea,
that they should be reduced to five in number in each county
and hold office as now, for five years.   One shall be appointed
and one pass out each year, the commission of the first one to
take effect the 1st of April next, and so on, so that at the end
of five years, when the commissions of all now in office will
have expired, there will be but five, and so on forever."

On Thursday, June 6th, 1844, Mr. Parker offered a reso-
lution requesting the secretary of state to furnish the number
of justices and judges in commission in each county and when
appointed.   Adopted.

The fact that this resolution was adopted by the convention
appears in its minutes, but a motion to print the reply of the
secretary of state was lost.

On Friday, June 7th, the vice president presented a com-
munication from the secretary of state to answer the call for
the number of judges and justices in the different counties,

from which it appears that there are six hundred and fifty-two judges and one thousand three hundred and ninety-five justices in the state. See journal of convention, June 4th and 6th, 1844, and reports in " Newark Daily Advertiser," issues of June 6th, 7th and 8th, 1844.

The report of the judiciary committee provided for the appointment of the judges of the Common Pleas by the governor.

On Wednesday, June 12th, Mr. Ewing offered an amendment that the judges of the Supreme Court, the Chancellor and the judges of the Court of Errors should be appointed by the joint meeting instead of the governor and senate.

Now it will be seen that article 5, section 1, as adopted, is a compromise between the majority and minority reports of the judiciary committee, and that one question for compromise was whether the courts not enumerated in this section should be fixed in the constitution or left to legislative will. If this section stood alone it would be futile to deny the completeness of legislative power. The inferior courts may, at this point, be altered or abolished, "as the public good shall require." This was the determination of the convention on the question of the vesting of the judicial power, but if the convention had stopped here it would have neglected one of the demanded reforms in the judicial system—the reorganization of the Inferior Courts of Common Pleas. Under the first section, standing alone, that reform would have been returned to the legislature, where relief had been so frequently refused. The convention, therefore, subtracted from the power to alter " as the public good shall require," and placed it beyond the province of the legislature to make certain alterations.

I. The legislature cannot alter the Inferior Court of Common Pleas so that one judge shall not be appointed every year, or so that more than one can be appointed in any year, except to fill a vacancy.

II. They cannot provide that a judge appointed to fill a vacancy can be appointed for more than the unexpired term.

III. They cannot alter this court so that the commission of a judge shall not " bear date and take effect on the 1st of April in every successive year."

IV. They could not alter the court so that it could be held by judges appointed by other than the senate and assembly in joint meeting.

V. They cannot now alter it so that judges can be nominated by other than the governor.

VI. They cannot alter it so that the judges shall not hold their office for five years.  On these points the power of the legislature to alter or abolish, as the public good may require, is limited by the constitution itself, by the unit from which the legislature derives its power.

The words " no more than five judges of the Inferior Court of Common Pleas in each of the counties of this state, after the terms of the judges of said court now in office shall terminate," were the compromise suggested by Mr. Browning and adopted by a convention seeking for a provision remedial of the great number of judges then entitled to hold these courts.  It was a compromise between the report of the majority, demanding a court of not less than three nor more than seven, and the minority recommendation that five should be selected from the then existing judges, and that thereafter there should be " but five judges of said court."  Mr. Browning's amendment was a politic one.  To have displaced over six hundred judges would have arrayed a small army against the adoption of the constitution, but his scheme does not, I respectfully submit, support the view that will allow the court to be filled by less than five judges.  The words " there shall be no more than five judges of the Inferior Court of Common Pleas in each of the counties of the state, after the terms of the judges of said court now in office shall terminate," were about the only words of limitation that could be used to preserve existing tenures, but standing alone they mean nothing on the question of the future constitution of the court. There is a declaration that there shall not be more than five, but no answer to the question, " How many shall there be ? "

The constitution says there shall be no more than five judges after a certain time. To have said " there shall be five judges of the court after the terms of the present judges expire" would have been unwise, for it would have raised the question whether the court could be held by a less number. The first sentence of section 6 is one of limitation, but the balance of the section fixes the number of judges there shall be.

The inferior courts may be altered or abolished, " as the public good shall require." Will anyone contend that under this power the legislature could enact that these courts should hereafter consist of six judges? This would be an alteration. Why may it not be effected? What virtue is there in the negative constitutional mandate that there shall be " no more than five judges," which is not found in the direction that " one judge for each county shall be appointed every year?" Can the legislature enact that one judge need not be appointed every year, and that all commissions issued subsequent to the 1st day of April, 1845, need not " bear date and take, effect on the 1st day of April in every successive year?" Then could the legislature of 1845 have enacted that the governor should not commission any judge of the Inferior Court of Common Pleas until the expiration of the terms of all judges now commissioned?

Legislative wit might determine that these courts should be held by members of the legislature, commissioned by the governor. This would be an alteration. Why would it not be good if omnipotence is to be ascribed to the power of the legislature to make whatever alteration or abolition it concludes is required by " the public good?"

Article 6, section 5, provides that the number of associate justices of the Supreme Court " may be increased or decreased by law, but shall never be less than two." Article 7 provides that the justices of the Supreme Court shall hold their offices for the term of seven years, and that their salaries shall not be diminished during the term of their appointments. If the act *sub judice* is constitutional, then six justices of the

Supreme Court of New Jersey hold their offices at the will of the legislature.    If this is so, the successful party in the case of *State* v. *Rogers,* 27 *Vroom* 480, could have removed from the court the justice whose opinion was unsatisfactory to that party.    If this is true the judicial system of this state has a frailty heretofore unsuspected.    If the act of 1896 is constitutional, the Supreme Court of New Jersey can be reorganized by any legislature desiring a particular construction of our constitution.    The legislative power to remove justices of the Supreme Court is greater than that given of alteration of the inferior courts.    They can be altered only as the public good shall require.    The Supreme Court justices can be removed at any time that the legislature determines that they shall go; and having reduced the number of associate justices to two on Monday, a court of nine can be provided for on Tuesday.

The act of 1896 provides that the judges commissioned under it shall hold their offices for five years, but article 7, section 2, paragraph 10, of the state constitution provides that "no commission for any office shall bear date prior to the expiration of the term of the incumbent of said office," while paragraph 2 of this section provides that judges of the Court of Common Pleas, when appointed to fill vacancies, shall hold for the unexpired term only.    In the counties of Salem, Ocean and Cape May all judges are summarily ejected by the act of 1896, but the single judge who is to be appointed in each county is not to "hold for the unexpired term only."    He is to hold his office for five years from the 1st of April, 1896. While the legislature was about the perfection of this scheme for the alteration of these courts, in accordance with the requirements of public good, it will be seen that they omitted one point.    It was agreed by the framers of our national constitution that judges should hold during good behavior.    The legislature presumably determined that the judges the governor would appoint would be better than the ousted ones, and necessarily determined, as to three counties at least, that the incumbents should not hold their offices for five years, and that the time they had served should not be subtracted from

the terms of the new-comers. The commissions for five years being revocable at legislative will, the legislature should have gone further in its experimental journey, and provided that the new appointments should be for life.

It is not provided that there shall be a law judge in each county. The Supreme Court assumes this to have been intended, but the act affords no relief to the boldness of the proposition that, in three counties at least, the judges commissioned for five years shall be ousted to make room for new appointees, whose commissions are to be for full terms.

One judge for each county shall be appointed every year, unless all subsequent commissions for judges of said court shall bear date and take effect on the 1st day of April in every successive year; unless they shall hold their offices for five years; unless no commission for any office shall bear date prior to the expiration of the term of the incumbent of said office; unless—is this to be the accepted reading of the constitution of New Jersey? If it is to be so in this department, the adjudication which sanctions this reading will mark a new era in constitutional construction. In everything not fixed by the constitution, the legislature is supreme. Everywhere the legislature may alter and abolish. That which is created by law may be dissolved by law, but, where the constitution prescribes, the province of the legislature is limited. If this is not true, if it is not true that the power to alter or abolish inferior courts is subject to every other provision of our constitution, then is the paper of 1844 like the one that came with the feast of pikes. "Solely as a paper, then, and as a hope, must this poor new constitution exist; in which shape one may conceive it lying, even now, with an infinity of other things, in that limbo near the moon. Farther than paper it never got, nor ever will get." *Carlyle's French Revolution.*

Light upon the meaning of section 6 of article 6 is thrown by paragraph 2 of section 2. In the construction of the Court of Errors and Appeals it is provided that, immediately after the court shall first assemble, the judges should arrange

themselves in such manner that thereafter one judge might be appointed annually. Why? The judges were to be selected from the laity. A new one was to be possible every year. Six judges of the Court of Errors and Appeals; term, six years. Five judges of the Court of Common Pleas; term, five years. Can there be any doubt that the spirit of one provision is found in the other?

At what time did the legislature acquire the right to reduce the number of judges of this court? Section 6 provides that there shall be no more than five, "after the terms of the judges of said court now in office shall terminate." Could the legislature of 1845 have done that which Mr. Randolph's rejected amendment proposed to do? Could that legislature have enacted that the number then in office should be reduced? Article 10, paragraph 2, provides: "All officers now filling any office or appointment shall continue in the exercise of the duties thereof, according to their respective commissions or appointments, unless, by this constitution, it is otherwise directed." Was this provision subject to the power to alter or abolish the inferior courts? If not, why should the power given in section 1 of article 6 outweigh the directions given in section 6?

A term fixed by the constitution cannot be altered by the legislature.

Article 7, section 9, of the constitution of Indiana provides that "the state shall, from time to time, be divided into judicial districts, and a judge for each circuit shall be elected by the voters thereof. He shall reside within the circuit and shall hold his office for the term of six years, if he so long behave well." In *State, Gibson, pros.,* v. *Friedley,* 21 *L. R. A.* 634, it is held that the term of a judge elected under this section could not be shortened by the abolition of his judicial district.

The constitution of Pennsylvania provides that the district judges of that state shall hold their offices for six years. In *Commonwealth* v. *Gamble,* 62 *Pa. St.* 343, Judge Gamble having been elected judge of Lycoming county, the act

creating his district was repealed and Lycoming county enacted a part of another judicial district. It was attempted to support this legislation by reference to constitutional power to reorganize and regulate courts, as unequivocally conferred by the constitution of Pennsylvania as is the power to alter and abolish by the constitution of this state. In declaring the act unconstitutional the court said: "What could be more destructive to all independence of action of a judge than the momentary liability, during the recurring sessions of the legislature, to be dismissed from the exercise of the functions of his office by the repeal or abolition of his judicial district. If all the while he must be conscious that he exercises the power and authority conferred by his commission only by the forbearance of the legislature, although it might be possible that independence of action might exist, it would be an exception; as a rule it would be a myth. Such a state of things as would follow a rule, the result of affirming the constitutionality of the act in question, would be utterly subversive of the independence of the judiciary and destructive of it as a co-ordinate branch of the government. The case of the twenty-ninth district this year might become that of any or half the other twenty-eight districts next year, for reasons quite as legitimate as those operating to procure its repeal. Establish this power in the legislature and it will be as easy as it will be common for powerful corporations and influential citizens to move the legislature to repeal districts and supersede judges who may not be agreeable to their interests and wishes and transfer their business to other jurisdictions supposed to be more favorably inclined. This would be a destruction of all that is valuable in the judicial office, and preservation alone of those dire qualities which flow from a subverted and subservient judiciary." *People* v. *Dubois*, 23 *Ill.* 547; *Cotton* v. *Ellis*, 7 *Jones* (*N. C.*) 545; *King* v. *Hunter*, 65 *N. C.* 603; *Keys* v. *Mason*, 3 *Sneed* (*Tenn.*) 6; *People* v. *Templeton*, 12 *Cal.* 394; *Dwyer* v. *Twitchell* (*Wash.*), 31 *Pac. Rep.* 21; *Warner* v. *People*, 2 *Denio* 272; *Kennedy* v. *Brunst*, 26 *Wis.* 412; *State* v. *Leonard*, 86 *Tenn.* 485; *Indiana* v. *Noble*, 4

*L. R. A.* 101 ; 12 *Am. & Eng. Encycl. L.* 18, 19, *tit.* "*Tenure of (Judicial) Office*," where every case cited supports the proposition that the legislature cannot enlarge or abridge a judicial term fixed by the constitution. See cases cited in *State, Smith, pros.,* v. *Askew,* 48 *Ark.* 87 ; *People* v. *Alberton,* 53 *N. Y.* 55.

The court should reconcile sections 1 and 6 of article 6 so they both may stand.

If two propositions of a constitution are irreconcilably repugnant, that which is last in order of time and in local position shall be preferred. *Quick* v. *Whitewater,* 7 *Ind.* 570 ; *Spencer* v. *State,* 5 *Id.* 41.

Where two acts of parliament, which passed during the same session and were to come into operation on the same day, are repugnant to each other, that which last received the royal assent must prevail. *King* v. *Middlesex,* 2 *Barn. & Ad.* 818.

Article 5, section 8, of the constitution of Texas confers on District Courts jurisdiction in cases involving $500. Section 16 of the same article vests in another court "exclusive original jurisdiction in all civil cases where the matter exceeds two hundred dollars and does not exceed five hundred." In *Railway Company* v. *Rambolt,* 67 *Tex.* 654, it was held that, there being an irreconcilable conflict between the provisions, the last provision should prevail.

But the court is not put to rejection of any provision of article 6 of our state constitution in allowing every word and letter the full weight it is entitled to as part of a unit. It is true that the proposition that the legislature might abolish the Court of Common Pleas is difficult to reconcile with the direction that the governor shall appoint a member of that court every year, commissioning him for five years, but the difficulty is created by an observance of words and a disregard of conditions.

It is the province of the court to keep all the provisions of the constitution intact. If the legislature can reduce the number of judges of the Court of Common Pleas, the adju-

dication that decides this must reject all of section 6 after the first sentence. It must destroy constitutional provision to enlarge, or at least preserve, the legislative power with which that provision is in seeming conflict.

What can be done in the way of harmonizing constitutional provisions is illustrated in *Re Contested Election of O'Neill,* 111 *Pa. St.* 235.

A statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence or word shall be superfluous, void or insignificant. *Den, James* v. *Du Bois,* 1 *Harr.* 285; *State* v. *Paterson,* 5 *Vroom* 167; *State* v. *Scudder,* 3 *Id.* 206; *Smith's Executors* v. *Tucker,* 2 *Harr.* 84; *Waters* v. *Quimby,* 3 *Dutcher* 311; *Rudderow* v. *State,* 2 *Vroom* 515, citing *United States* v. *Fisher,* 2 *Cranch* 399. No exception to this proposition can be found in the adjudication of any other state.

The proposition thus illustrated by the adjudication of this state is elementary. "One part of a statute must be so construed by another that the whole may (if possible), stand *ut reas magis valeat, quam pereat.* And if land be vested in the king and his heirs by act of parliament, saving the right of A, and A has at that time a lease of it for three years, here A shall hold it for his three years, and afterwards it shall go to the king, for this interpretation furnishes matter for every clause of the statute to work and operate upon. 1 *Bl. Com.* 89.

So, if the constitution provides that the legislature may alter or abolish the Inferior Court of Common Pleas, but also provides that the governor shall appoint one judge every year, and that the judges shall each hold office for five years, there is ample matter for the legislative power to work upon. It can abolish the court, and the governor will not be called upon to act, for he is called upon only to appoint judges of the Inferior Courts of Common Pleas, and there cannot be an appointment to courts no longer existing. It can alter the courts as to jurisdiction, as to terms of holding, as to qualifications of judges, but it cannot abrogate the constitutional

mandate that " one judge for each county shall be appointed every year," or that the judges of the court " shall be nominated by the governor and appointed by him, with the advice and consent of the senate," or that the judges " shall hold their offices for five years."

" The rule applicable here is that effect is to be given, if possible, to the whole instrument and to every section and clause.   If different sections seem to conflict, the court must harmonize them, if practicable, and must lean in favor of a construction which will render every word operative, rather than one which makes some words idle and nugatory.   \* \* \* It is scarcely conceivable that a case can arise where a court would be justified in declaring any portion of a written constitution nugatory because of ambiguity.   One part may qualify another so as to restrict its operation, or apply it otherwise than the natural construction would require if it stood by itself; but one part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together."   *Cooley Const. L.* 72.

To the doctrine thus stated, it may be safely said that exception has not been taken in any reported case.   Mr. Justice Magie, in *Schalk* v. *Wrightson*, 29 *Vroom* 93, says: " If a part of the instrument, by express and unmistakable words, grants a power, such grant must not be construed as defeated .or even limited in its operation, by other clauses of the same instrument, unless the latter are wholly incompatible with the unrestricted grant."   I have not been fortunate enough to find a text-book or decision that sustains this proposition as a rule of constitutional interpretation.   As all powers not reserved are in the legislature of this state, and as the legislative authority given in section 1 is there for the purpose of limiting the reservation otherwise found in the section, is it not the accepted doctrine that the power must be construed in the light of every word in the document?

The rule of construction which will prevent the appointment of more than five judges, limits the operation of the grant of power to alter or abolish, and that rule is applicable to every word in section 6.

The provision authorizing the legislature to alter or abolish the inferior courts must be read with the clause prescribing the mode of appointing judges of the Common Pleas.  *Schalk* v. *Wrightson, supra.*  What greater virtue is there in the constitutional direction that the governor shall appoint than is found in the provision that he shall appoint one every year; that appointments to fill vacancies shall be for unexpired terms, and that the judges shall hold office for five years?

In *Schalk* v. *Wrightson, supra,* Mr. Justice Van Syckel says that the provisions relating to the tenure of office are not susceptible of change by the legislature.  But the act of 1896 can only be sustained on a theory that judges of the Court of Common Pleas are dismissible at the will of the legislature, and that all vacancies may be filled for full terms.

The question whether the governor must not appoint five judges for each Court of Common Pleas is not relegated by the doctrine of *stare decisis.*  In the case of *Engeman* v. *State,* 25 *Vroom* 247, the question was in nowise involved, nor is it settled in Schalk *v.* Wrightson.  Each of those cases could have been decided without reference to the question involved in this, and I respectfully submit that all the judicial expressions in those cases which are seemingly decisive of the power of the legislature to reduce the number of judges are merely *obiter dicta.*

There is one proposition common to the tenure of the six judges of the Court of Errors and Appeals and the judges of the Court of Common Pleas, that, to my mind, is conclusive of the intent of the framers of our constitution.  They intended that one judge should leave each of these courts every year. To secure this, it was necessary that vacancies should be filled for unexpired terms.  This is provided in express words. One term in each Court of Common Pleas in each county of New Jersey commenced on the 1st day of April, 1845, 1846, 1847, 1848 and 1849.

In distinction from this, justices of the Supreme Court and the Chancellor are appointed for full terms of seven years, however the vacancy occurs.  Why this difference?  The

constitution answers : " In order that one judge [of the Court of Errors] may be appointed annually," and in order that the commissions of the judges of the Common Pleas may " bear date and take effect on the first day of April in every successive year." Mr. Browning, by the record, answers : "One shall be appointed and one pass out every year, the commission of the first one to take effect the first day of April next, and so on, so that at the end of five years, when the commissions of all now in office will have expired, there will be but five, and so on forever."

In *Schalk* v. *Wrightson, supra,* this court says : "The provision authorizing the legislature to alter or abolish the inferior courts must be read with the clause prescribing the mode of appointing judges of the Common Pleas." But the mode of appointment is that the judges shall be appointed as provided in section 6—one every year. What is there in the proposition that the joint session or the governor shall appoint that will raise the investment of this power above the recognition to be accorded to section 6 ? The provisions of section 6 not only fix the maximum number allowable after a certain period, but they go further, and tell how the court shall be composed. The constitution says not only that the governor shall nominate, but how and when he shall appoint. To credit to the first sentence of section 6 "authority granted [by clear implication] to the legislature to reduce the number of judges," as is done in the prevailing opinion in Schalk *v.* Wrightson, is to ignore the balance of the section and to say that there cannot be found in that section an answer to the query, " How many shall there be ? " How can there be one judge appointed for each county every year if the judges are to hold office for five years and the number of judges in each county can be reduced to one ? Is it not the truth that the legislature has nothing whatever to do with the number of judges of the Court of Common Pleas ? How can commissions bear date and take effect on the 1st day of April in every successive year, if there are appointments to be made only in one year of every five ? By what rule of constitutional

construction can the provisions of section 6 be rejected in order to give absolutism to the legislative power found in section 1 ?

The constitution cannot be made to read that there shall be one judge for each county appointed every year, unless the legislature shall reduce the number, any more than it can be made to read that these judges shall hold office for five years, unless the legislature shall change the term. It cannot be made to read that commissions for judges of said court shall bear date and take effect on the 1st day of April in every year, unless the legislature changes this order of things. The power of the legislature is restricted by the constitution. It is an instrument of restrictions. The power to alter or abolish is confined to those matters in which the constitution is silent.

That the governor must appoint a judge of the Inferior Court of Common Pleas every year, that the scheme of section 6 must be observed, is, I respectfully submit, an insistment to which no bar to presentation is found in the adjudication of this court. That the act of 1855 (*Pamph. L.*, *p.* 17) was, in so far as it made a justice of the Supreme Court *ex officio* a judge of the Court of Common Pleas, unconstitutional, is clear. It is true that the introduction of the justice to the Common Pleas bench was unchallenged, "so far as the reported cases show." *Engeman* v. *State*, 25 *Vroom* 252. But are we not told, in *State* v. *Wrightson*, 27 *Id.* 12, that " where the meaning of the constitution, interpreted by its letter and its spirit, is ascertained, such extraneous considerations [as contemporary and practical construction] cannot be allowed to abrogate the text or fritter away its obvious sense." Could the act of 1895, invalidated in Schalk *v.* Wrightson, have remained on the statute-book long enough to deprive the governor of New Jersey of his appointing power? In Engeman *v.* State, this court says : " The power to alter or abolish seems necessarily to imply and carry with it authority to change and modify the structure of the courts, as well in the mode of appointment as in the number of judges," but it

was only necessary, in this case, to pass upon the question of whether the legislature could alter the Courts of General Quarter Sessions, and legislative power to change the location of the appointing power of judges of the Inferior Court of Common Pleas is denied in Schalk v. Wrightson.

The power to alter or abolish is the power to legislate, but that power is limited to the points on which there is no constitutional expression. If the legislature cannot take from the governor the power to appoint judges of the Inferior Court of Common Pleas, then it cannot take from him the power to appoint one in each county each year, so long as the court exists.

The Supreme Court says : " The public policy sought to be accomplished by this legislation was the exclusion of what is known as the lay element from these courts, constituting the courts of law judges." So far from doing this, one of the provisions of the act is such that it may be questioned whether lay judges may not be appointed to succeed the law judges now in office.

For the defendant in error, *Foster M. Voorhees* and *Frank Bergen.*

The only question in this case is whether chapter 102 of the laws of 1896 (page 149) is constitutional or not.

The validity of the act depends entirely on the question whether the legislature has power to alter the Inferior Court of Common Pleas without regard to the unexpired terms of judges of that court. If the legislature has such power, the limit of alteration is entirely a matter of legislative discretion. There is nothing in the constitution restricting the exercise of the power.

Section 1 of article 6 of the constitution declares " the judicial power shall be vested in a Court of Errors and Appeals in the last resort in all causes, as heretofore; a Court for the Trial of Impeachments; a Court of Chancery; a Prerogative Court; a Supreme Court; Circuit Courts, and such inferior courts as now exist and as may be hereafter ordained

and established by law, which inferior courts the legislature may alter or abolish, as the public good shall require."

The Common Pleas is one of the inferior courts referred to in the foregoing provision of the constitution. In paragraph 12 of the constitution of 1776 the Courts of Common Pleas are declared to be inferior courts, and the same expression occurs twice in the present constitution. Art. 6, § 6, ¶ 1, and Art. 7, § 2, ¶ 1. The expression also occurs in the act of 1855 (*Rev., p.* 221, § 59), and again in an act passed in 1887. *Pamph. L., p.* 133.

The Courts of Common Pleas are not only nominally but in fact inferior courts, as their proceedings are subject to review by the Supreme Court and Court of Errors.

No one until recently has ventured to doubt the power of the legislature to alter or abolish every court in the state not named in the first section of the sixth article of the constitution. That such power existed has been the common opinion of the bar for more than half a century, and this opinion has been emphasized repeatedly by statements in the decisions of our courts. See *Embley* v. *Hunt*, 2 *Stew. Eq.* 306; *Entries* v. *State*, 18 *Vroom* 140, 141; *Engeman* v. *State*, 25 *Id.* 251, 252, 274. And in the recent case of *State* v. *Wrightson*, 29 *Id.* 50, it was held that " the legislature may reduce the number of judges of the Common Pleas to any number less than five, and may prescribe the qualifications of the judges."

It must be conceded that all the provisions of the constitution relating to the Courts of Common Pleas should be considered together, in order to determine whether the explicit language of one provision is modified by any other, and we respectfully insist that there is nothing in the constitution inconsistent with the explicit authority given to the legislature in the first section of the sixth article to alter or abolish the Courts of Common Pleas whenever the legislature thinks proper to do so.

The clauses of the constitution that are relied on by counsel for the relator (and in the *dictum* in the Wrightson case), and which are said to nullify or restrict the explicit language of

the first section of article 6, do not, we think, have any such effect.

Paragraph 10 of section 7 of article 4, which gives to the legislature power to vest in the Circuit Courts and Courts of Common Pleas chancery powers, so far as relates to the foreclosure of mortgages, simply means that such powers may be conferred upon the Courts of Common Pleas while these courts exist, but does not, as we think, conflict with the power given to the legislature to alter or abolish those courts.

In paragraph 1 of section 6 of article 6 it is provided that "there shall be no more than five judges of the Inferior Court of Common Pleas in each of the counties of this state after the terms of the judges of said court now in office shall terminate." But this clearly does not mean that there shall always be at least five judges of such courts while the courts exist, nor that the courts shall continue to exist until abolished by constitutional amendment.

The clause in the same paragraph stating that " one judge for each county shall be appointed every year, and no more, except to fill vacancies, which shall be for the unexpired term only," simply means that while the court shall consist of five judges, one shall be appointed every year, except to fill vacancies.

The other provision of the constitution relating to the Courts of Common Pleas is paragraph 1 of section 2 of article 7, in which it is provided that "judges of said courts shall be nominated by the governor and appointed by him with the advice and consent of the senate," but evidently this provision does not interfere with the power of the legislature to reduce the number of judges, although while the court in fact exists, no doubt, they must be appointed in the manner prescribed.

The second paragraph of section 2 of article 7 is obsolete.

If we have not correctly stated the true meaning of the clauses of the constitution relating to the Courts of Common Pleas other than that in section 1 of article 6, it is impossible to give effect to that clause, and we must conclude

that power was given to the legislature to alter or abolish the Courts of Common Pleas in one paragraph of the constitution, and at the same time and by the same instrument that power was withdrawn.

We do not think it is necessary to go into an elaborate argument, criticising a few words here and there in the constitution to establish the proposition that the legislature has power to alter or abolish the Courts of Common Pleas. That power is clearly conferred in the first paragraph of article 6, and there is nothing elsewhere in the constitution which, rightly considered, throws any serious doubt upon it. More than forty years ago the legislature passed an act reducing the number of judges of the Courts of Common Pleas from five to three (*Rev., p.* 221, § 59), and provided that the justices of the Supreme Court should be *ex officio* judges of the Courts of Common Pleas, although not nominated by the governor or appointed judges of that court in the manner then directed by the constitution. The question whether a justice of the Supreme Court can be made a judge of the Court of Common Pleas by such legislation as that of 1855 is not at present before the court, but the fact that the act of 1855 was passed only a few years after the present constitution was adopted, and has remained unquestioned for more than forty years, is very strong evidence of the contemporary opinion prevailing among the highest authorities as to the power of the legislature to alter the Courts of Common Pleas at pleasure.

The only question in the present case that has not been settled by a decision in this state is whether judges of the Courts of Common Pleas can be removed from office by the legislature during the terms for which they have been appointed and commissioned.

It is well settled that an appointment to office and acceptance thereof by the appointee does not constitute a contract, and that any office created by the legislature may be abolished at any time, and the term of office ended. *Hoboken* v. *Gear,* 3 *Dutcher* 265; *State* v. *Curran,* 15 *Vroom* 181, 188, 189; *Long* v. *Mayor,* 81 *N. Y.* 425; *Taft* v. *Adams,* 3 *Gray* 126.

The reason, as we understand it, why the legislature may put an end at any time to the term of an office created by law, is because of its power to abolish the office, and because there is no contract relation between the state or municipality and the official that he may serve for the term for which he may have been elected or appointed. This reason applies in all its force to the office of judge of the Courts of Common Pleas in this state. The legislature has the same power under our constitution over the structure and existence of the Courts of Common Pleas as it would have if those courts had been created and existed by act of the legislature only.

In all cases where the legislature may abolish an office it may curtail the term. In the month of March, 1891, an act was passed putting an end to the terms of all the judges of the District Courts then in office, on the 1st day of April of that year, and providing a different method of appointment. *P. L.* 1891, *p.* 64. No one ever questioned the constitutionality of that act of the legislature, and the act of 1896, now called in question, rests upon the same foundation.

We have examined all the cases cited on the argument in the Supreme Court by counsel for the relator in support of the contention that the relator could not be expelled from office by the act of 1896 for the reason that the term for which he was appointed had not expired, but none of the cases support that contention. The offices referred to in those cases were not subject to abolishment by the legislature, and consequently the decisions are not in point.

The following authorities sustain the power of the legislature to remove the relator from office, if it is true, as we suppose, that a court established by a constitution, but subject to alteration or abolishment by a statute law, stands in the same position as a court created and sustained by statute only: *Rutgers* v. *New Brunswick*, 13 *Vroom* 51 ; *Long* v. *Mayor*, 81 *N. Y.* 425 ; *Hoboken* v. *Gear, supra ; Mech. Pub. Off.*, &c., § 465.

We do not think that any question is at present before the court relating to the method prescribed in the act of 1896 for

the appointment of judges. The expression "by and with the advice and consent of the senate," instead of "with the advice and consent of the senate," is taken literally from the constitution of the United States. We do not see any substantial difference in the meaning of the two expressions, and, as the act of appointment necessarily involves nomination, the use of the expression "nominate and appoint," instead of "appoint," merely, is not significant.

It being a matter of public importance that this case should be disposed of on its merits without delay, we have not thought it proper to object strenuously to the method in which the question is presented to the court, but it is clear that the present application is an effort to use the writ of *mandamus* in a very extraordinary manner. If the act in question is unconstitutional there would seem to be nothing to prevent the relator from holding a Court of Common Pleas in Hudson county, without reference to the views or wishes of the respondent and claiming and collecting his salary as heretofore. In the case of *Grey* v. *Bastedo,* 17 *Vroom* 453, it was held that a single judge of the Court of Common Pleas may hold that court and perform all its functions, and consequently the fact that the respondent declines to confer or associate officially with the relator is not an injury to him nor a public wrong which can properly be redressed by a writ of *mandamus.*

The opinion of the court was delivered by

DIXON, J. The *mandamus* contained in this record is a peremptory writ in form, but it was treated in the Supreme Court and on argument here as an alternative writ, and therefore will be now so regarded. The defendant filed a demurrer to it, and the relator having joined in the demurrer, the Supreme Court gave final judgment for the defendant.

The first question to be considered is whether, upon such a judgment, error will lie.

At the common law a peremptory writ of *mandamus* was always awarded or denied on the return to the alternative writ. If the return was, on its face, insufficient, it was

quashed and a peremptory writ was awarded. If the return was, on its face, sufficient, a peremptory writ was denied, unless the relator, by a separate action against the defendant to recover damages for making a false return, obtained a final judgment that the return was false and so vindicated his right to a peremptory writ. On an award of the writ in such proceedings error would not lie. *King* v. *Dean and Chapter of Dublin,* 1 *Str.* 536 ; *S. C. on error,* 1 *Bro. P. C.* 73. The reasons for this rule, which are given only in the King's Bench report, were partly technical and partly substantial—technical, in that the proceedings contained no formal judgment (*ideo consideratum est*); substantial, in that the right was not there adjudicated, but either was confessed by the defendant in his return or had been established in the action for a false return.

The same rule holds in New Jersey, when the common law procedure is followed. *Layton* v. *State,* 4 *Dutcher* 575 ; *American Transportation Co.* v. *New York, Susquehanna and Western Railroad Co., ante p.* 156. So, also, did it in New York. *People* v. *Brooklyn,* 13 *Wend.* 130.

But the statute of 9 *Anne, c.* 20, did away with the reasons for this rule, in the cases which it covered, by providing that the relator might plead to or traverse the material facts contained in the return, and that the person making the return should reply, take issue or demur, and thereupon such further proceedings should be had as if the relator had brought his action for a false return, and the relator might have judgment for damages and costs or the defendant might have judgment for costs. Under this statute there was a real determination of the rights of parties and a formal judgment for the successful litigant, and accordingly Blackstone says that in cases within the statute the proceedings are in the nature of an action, and a writ of error may be had thereupon. 1 *Bl. Com.* 265. To the same purport is the editor's head-note in 1 *Bro. P. C.* 73. So, also, Littledale, J., in *Rex* v. *Mayor, &c., of London,* 3 *Barn. & Ad.* 255, 281.

On December 2d, 1794, a statute was passed in New Jersey extending to all cases the procedure prescribed in 9 *Anne*, *c.* 20. *Gen. Stat., p.* 2000. A like statute was also passed in New York. Under these laws a somewhat different practice obtained in this country from that pursued in England. There the words of the act were very closely adhered to, and as they do not in terms authorize a demurrer to the return or to the alternative writ, the practice was to challenge their sufficiency in law, not by a formal demurrer, but on a *concilium*, which was in the nature of a demurrer. *Rex* v. *Margate Pier Co.*, 3 *Barn. & Ald.* 220 ; *Rex* v. *London*, 3 *Barn. & Ad.* 255, 279 ; *Rex* v. *Oundle*, 1 *Ad. & E.* 283 ; *Regina* v. *St. Saviour*, 7 *Id.* 925 ; *Regina* v. *Ledgard*, 1 *Q. B.* 614. Whether the determination of the court on such an argument was reviewable by writ of error seems doubtful, the negative apparently being assumed in *Rex* v. *Margate Pier Co., supra*, and in *Rex* v. *Oundle, supra*, and the affirmative in *Regina* v. *St. Saviour*, 7 *Ad. & E.* 936, and in *Regina* v. *Kendall*, 1 *Q. B.* 366. Afterwards the statute 6 and 7 *Vict., c.* 67, authorized a demurrer to the return and expressly gave a writ of error in any case within the acts.

But in New York and New Jersey the practice of demurring to the return always prevailed. *People* v. *Champion*, 16 *Johns.* 60 ; *Ex parte Jennings*, 6 *Cow.* 518, 536 ; *Silverthorne* v. *Warren Railroad Co.*, 4 *Vroom* 173 ; *S. C., Id.* 372 ; *Munday* v. *Rahway*, 14 *Id.* 338, 348 ; *Gallagher* v. *Board of Public Works*, 16 *Id.* 465. And in both states the practice was commended as one enabling either party to review the judgment by writ of error. Per Spencer, J., in 16 *Johns.* 65 (1819), and per Beasley, C. J., in 4 *Vroom* 178 (1868). See, also, *Commercial Bank* v. *Commissioners*, 10 *Wend.* 25.

From all these authorities it appears to be beyond doubt that, when the proceedings for *mandamus* take the form of pleadings in personal actions, so that the rights of the parties are presented for determination therein and a final judgment is rendered, a writ of error lies according to the principles of the common law. The statute of March 17th, 1870 (*Gen.*

*Stat., p.* 2001), expressly sanctioning such writs of error, was merely declaratory of an existing right.

A still wider departure from the letter of the statute of 1794 has taken place in this state, viz., the practice of demurring to the alternative writ itself.    *Fairbank* v. *Sheridan*, 14 *Vroom* 82 ; *Rader* v. *Township of Union, Id.* 518 ; *Hopper* v. *Freeholders*, 23 *Id.* 313 ; *Wilbur* v. *Trenton Passenger Railway Co.*, 28 *Id.* 212.    This practice is justified on the ground that it tends to simplicity without in the least jeopardizing any right, and is in harmony with the modern idea, which likens the application for a *mandamus* to a personal action and the alternative writ to a declaration therein.   As a demurrer to the return opens for examination the contents of the writ itself (*Belvidere* v. *Warren Railroad Co.*, 5 *Vroom* 193, 195), and final judgment thereon is subject to review by writ of error, there is no reason why the same matter may not be considered on a demurrer directly aimed at the writ, or why the judgment on that matter so determined should not be similarly reviewed.

For these reasons we think the present writ of error should be sustained.

Consequently, we come to the merits of the question decided below, which is whether the relator was entitled to exercise the functions of a judge of the Court of Common Pleas in the county of Hudson.

This question turns upon the validity of the act of March 26th, 1896 (*Pamph. L., p.* 149), which enacted that after March 31st, 1896, there should be but one judge of that court in each county ; that he should be the president law judge then in office and his successors, and that the terms of office of all other judges of said court should end on March 31st, 1896.

The relator contends that, under the constitution of this state, the legislature has no power to reduce the number of judges in this court, and therefore the act is invalid.

The pertinent provisions, as found in the constitution of 1844, are these :

Article 6, section 1—"The judicial power shall be vested in

a Court of Errors and Appeals in the last resort in all causes, as heretofore; a Court for the Trial of Impeachments; a Court of Chancery; a Prerogative Court; a Supreme Court; Circuit Courts, and such inferior courts as now exist and as may be hereafter ordained and established by law, which inferior courts the legislature may alter or abolish, as the public good shall require."

Article 6, section 6—" 1. There shall be no more than five judges of the Inferior Court of Common Pleas in each of the counties in this state, after the terms of the judges of said court now in office shall terminate. One judge for each county shall be appointed every year, and no more, except to fill vacancies, which shall be for the unexpired term only.

" 2. The commissions for the first appointments of judges of said court shall bear date and take effect on the first day of April next, and all subsequent commissions for judges of said courts shall bear date and take effect on the first day of April in every successive year, except commissions to fill vacancies, which shall bear date and take effect when issued."

Article 7, section 2—" 2. Judges of the Courts of Common Pleas shall be appointed by the senate and general assembly in joint meeting. They shall hold their offices for five years, but when appointed to fill vacancies, they shall hold for the unexpired term only."

Article 6, section 6, and article 7, section 2, taken together, seem to indicate that the number of judges in this court for each county was fixed at five. This is the natural purport of the provisions that one judge, and no more, for each county, shall be appointed every year; that the commissions of judges of this court shall take effect on the 1st day of April in every successive year, and that they shall hold their offices for five years. While the first clause of article 6, section 6, that there shall be no more than five judges in each county, may be thought to contain an implication that there might lawfully be less, yet this implication is hardly clear enough to countervail the express provisions before mentioned. The language of that clause is readily accounted for by the fact that the number had previously been large and indefinite.

But article 6, section 1, expressly authorizes the legislature to alter or abolish this court, and of course due effect must be given to these words.    Indisputably, the abolition of the court must end the functions of the judges, and if the legislature should exert its power to abolish the court, there could not remain five or any persons authorized to act as judges thereof.    But the alteration of the court need involve no such consequence.    The power to alter the court could have reasonable scope without including the power to change the number of judges.

If, therefore, this were *res integra*, my interpretation of the constitution would be that, so long as the legislature left the Court of Common Pleas in existence, its judges must be five in each county, one appointed every year, and holding his office for the term of five years, except when appointments were made to fill vacancies, but that the legislature could at any time abolish the court, and thereby end the functions and terms of the judges.    This, I think, would accord due force to every word of the organic law on this subject.

But the matter is not *res integra.*

On February 9th, 1855, the legislature passed an act to reduce the number of judges in the Court of Common Pleas to three and empowering justices of the Supreme Court to sit as judges in the lower court.    This act was approved by the governor.    It contravened the above interpretation of the constitution, and also the apparent purport of the clause which required judges of the Common Pleas to be appointed by the two houses in joint meeting for a term of five years, for justices of the Supreme Court were appointed by the governor and senate for a term of seven years.    Since that statute many others have been enacted changing the number of judges in this court.    See *Pamph. L.* 1859, *p.* 421 ; *Id.* 1868, *pp.* 363, 580 ; *Id.* 1869, *pp.* 105, 306, 681 ; *Id.* 1871, *p.* 925 ; *Id.* 1878, *pp.* 315, 533 ; *Id.* 1880, *pp.* 240, 397 ; *Id.* 1885, *p.* 414 ; *Id.* 1889, *pp.* 492, 495.    It is thus seen that for a period of over forty years, beginning shortly after the adop-

tion of the constitution, the legislature has claimed the power to alter the number of judges and to determine who shall compose the Court of Common Pleas. Not only have the executive and judicial departments acquiesced in this claim, but whenever the matter has been presented to either of them the claim has received their sanction. Thus, in 1875, an amendment of the constitution transferred the power of appointing the judges to the governor with the consent of the senate, and since that time he has appointed, not one every year, but only so many as the statutes required. Since the passage of the act of February 9th, 1855, the justices of the Supreme Court have sat as members of the Common Pleas under this legislative authority only, and whenever questions as to the composition of the Court of Common Pleas have been raised, the higher courts have always had recourse to the statutes, not to the constitution, for their solution. Thus, every department of the government has, for more than a generation, gathered from the constitution a meaning which confers upon the legislature power to alter the Court of Common Pleas in the respects stated. This uniform construction, begun so soon after the fundamental law was framed and continued so long, must be regarded as settling the meaning of that instrument in clauses which are of themselves somewhat contradictory. The authorities for resorting to this practical construction in the exposition of the organic law are presented with such fullness by Mr. Justice Depue's opinion in *State* v. *Wrightson*, 27 *Vroom* 126, 206, that they need not be here collated. Other cases may be found cited in 23 *Am. & Eng. Encycl. L.* 340, and a very recent decision is *Commonwealth* v. *Reeder*, 33 *Atl. Rep.* 67; *S. C.,* 33 *L. R. A.* 141.

It is further insisted that, even if this long-continued usage controls, yet, as the legislative practice has been to retain the judges in office until their terms ended by lapse of time, the act of 1896 was unwarranted in its attempt to deprive the judges of their functions before their prescribed terms had expired.

But in this position due regard is not given to the force

of the usage. Its proper effect is to define the scope of the clause which empowers the legislature to alter the court so as to make it inclusive of the power to change the number of the judges. If we then ask, when may such an alteration of the court take place? the words of the constitution furnish the answer: The legislature may alter the court "as the public good shall require." Such words, annexed to a legislative power, confer upon the legislature the absolute authority to determine when its exercise shall take effect. If the legislature enacts that the change shall occur at once, the courts cannot adjudge that it shall occur only as pending terms expire. The fact that heretofore the legislature has thought the public good required changes to be made in the number of judges, only in consonance with the reasonable expectations of the then incumbents, cannot prevent the legislature from now forming a different opinion as to the present requirements of the public service, nor confer upon the courts any right to supervise the discretion of the legislature.

Our conclusion, therefore, is that on and after March 31st, 1896, the relator was not entitled to sit as a judge of the Court of Common Pleas of Hudson county, and the judgment of the Supreme Court should be affirmed.

MAGIE, J. I vote to affirm the judgment in this, case upon the grounds stated by Mr. Justice Depue in his opinion in the Supreme Court, with which I entirely concur.

*For affirmance*—THE CHANCELLOR, DIXON, GARRISON, LIPPINCOTT, MAGIE, BARKALOW, DAYTON, HENDRICKSON, KRUEGER, NIXON. 10.

*For reversal*—None.