OLIVIA WRIGHTSON SWITZ, PLAINTIFF-RESPONDENT, v. TOWNSHIP OF MIDDLETOWN, IN THE COUNTY OF MONMOUTH, A MUNICIPAL CORPORATION, WILLIAM C. JOHNSON, ASSESSOR OF THE TOWNSHIP OF MIDDLETOWN, AND MONMOUTH COUNTY BOARD OF TAXATION, DEFENDANTS-APPELLANTS.

Argued November 26, 1956—Decided March 11, 1957.

Mr. *Lawrence A. Carton, Jr.,* argued the cause for the appellant Township of Middletown and William C. Johnson, assessor (*Messrs. Roberts, Pillsbury & Carton,* attorneys).

Mr. *Herbert J. Hannoch* argued the cause for the respondent (*Mr. William S. Myers,* of counsel; *Messrs. Hannoch, Weinstein, Myers & Stern,* attorneys).

Mr. *John F. Crane,* Deputy Attorney-General, argued the cause for the respondent Monmouth County Board of Taxation (*Mr. Grover C. Richman, Jr.,* Attorney-General, and *Mr. Thomas P. Nolan,* Deputy Attorney-General, on the brief).

The opinion of the court was delivered by

HEHER, J. By summary judgment for the plaintiff entered in the Superior Court in this proceeding in lieu of the prerogative writ of *mandamus,* the defendant assessor of the Township of Middletown was directed to "value and assess" all taxable real property in the township for the year 1957 and subsequent years "by uniform rules and according to the same standard of value, which standard shall be the full and fair value of such real property and at the price at which, in his judgment, such property would sell for at a fair and *bona fide* sale by private contract on October 1st of the preceding year"; and the defendant Monmouth County Board of Taxation was enjoined, "by May 1, 1956 in accordance with law, to investigate, revise, correct and equalize all assessments made" by the defendant assessor of taxable property in the township for the tax year 1956 "and subsequent years" and, in particular, to revise, correct and equalize all such assessments by "uniform rules and according to" the given standard of "full and fair value."

And the assessor was directed, in the event the county board "should require him so to do," "in accordance with *R. S.* 54:4–16 and other applicable statutes," to "make up and prepare corrected tax lists and duplicates for the tax year 1956 under the supervision of said board, * * * in which corrected tax lists and duplicates he shall comply with the directions of said board and shall value and assess all real property subject to taxation" in the township by the same standard of "full and fair value."

The defendant township was ordered to "appropriate in accordance with law, such monies as may reasonably be necessary and required by it and by" the defendant assessor "to comply with the foregoing."

By way of cross-claim, the township and the assessor alleged that on September 28, 1955 the Director of the Division of Taxation, "in the further performance of his duties under *N. J. S. A.* 54:1–35.1, determined the average ratio of assessed value to true value of the real property in each of the other 51 municipalities in the County of Monmouth";

that the "percentages in each case were less than 100% of true value," and there was no appeal from this determination by any of the municipalities, and the time for appeal had expired; that the assessors of the other municipalities of the county "are now preparing or shortly will prepare and file" their respective real property assessment lists and tax duplicates for 1956, and in the event of judgment in accordance with the prayer of the complaint, "these defendants will be required to bear a disproportionate and excessive portion of the taxes and tax burden" of the county; and that "it is the duty" of the county tax board to investigate, revise, correct and equalize "all assessments in all taxing districts" in the county "so that all tax assessments are determined by uniform rules and according to the same standard of value, and annually to ascertain and determine, according to its best knowledge and information, the general ratio or percentage of full value at which the real property of each taxing district is assessed" and to ":prepare an equalization table showing the assessed valuation of the real property in each district and the ratio or percentage by which the assessed valuation shall be increased or decreased in order to correspond to true value"; and there was a demand that if judgment be entered against the township and the assessor in accordance with the complaint, the county tax board be ordered to "investigate, revise, correct and equalize" "all assessments made by the various assessors and assessing agencies of taxable property" in the several taxing districts of the county for 1956 and thereafter, "so that the valuation of real property in each district, as equalized, shall be determined to be the true valuation of such property in computing the total ratables of each district for all apportionments of County and State taxes for distribution of money."

The cross-claim was dismissed.

On defendants' joint appeal the Appellate Division, 40 *N. J. Super.* 217 (1956), affirmed the judgment, save as modified (a) "to relieve all parties of its mandate" for the year 1956; (b) to vacate the "mandatory order to compel

fulfillment of the [county] board's statutory duty in the future" and (c) to "show a dismissal" of the cross-claim "without prejudice."

We certified the judgment for appeal on defendants' motion. It was stipulated in the trial division: (1) the defendant assessor had filed with the county board of taxation "his 1956 Tax List and Duplicate for the defendant Township," "prepared in accordance with the same general practice and procedure that was employed by said assessor for 1955 and prior years," and "In making such assessments" he "believed that he was following the practice of other tax assessors throughout the County and State"; (2) the "assessments therein contained are less than 100% of the full and fair value of the assessed properties as of October 1, 1955 and less than 100% of the prices at which the assessed properties would have sold for at a fair and *bona fide* sale by private contract on October 1, 1955"; and (3) on September 28, 1955 the Director of the Division of Taxation, "in the further performance of his duties under *N. J. S. A.* 54:1–35.1, *et seq.,* determined that the average ratio of assessed value to true value of the real property in the Township is 15.45%," as alleged in paragraph 10 of the complaint, and in his investigation resulting in this determination, the Director "considered 862 current sales of property made in said Township reported to him by the defendant assessor," the "total amount of all such sales" being $9,268,037, and "the total amount of the assessments upon the properties so sold," but $1,385,575, as alleged in paragraph 11 of the complaint, and these averments "are admitted with respect to the 1955 assessments, and the determinations of the Director [are] also generally applicable to the aforesaid 1956 assessment list." The complaint also alleged: (1) the *Sixth Report of the Commission on State Tax Policy* "disclosed that residential property" in the township "was assessed at 14% of true value," and "commercial and industrial property * * * at 18% of true value"; (2) the Director, in fixing the amount of school aid to which the township was entitled, "had, on October 1, 1954, determined that real estate in

the Township was being assessed at 16% of true value";
(3) the county board, "in the performance of its duty to
equalize 1955 assessments in the various separate taxing
districts" of the county "had determined that for the year
1955 no change should be made in the assessments made by
the defendant assessor"; and (4) 124 of the 862 current
sales considered by the Director in his determination of
September 28, 1955 represented sales of vacant land, and
the 1955 assessments on such lands varied from 6.04% of
the sales price to 80% thereof; 728 sales involved residences,
and the 1955 assessments thereon varied from 3.08% of the
sales price to 80%; 5 concerned farms, the assessment varia-
tion here being from 10.43% of the sales price to 35.16%,
and 5 real estate of other classifications, the assessments
varying from 10.10% of the sales price to 30.97%.

The complaint further declared that plaintiff's property
was assessed at $31,000 for 1955, and had "all real property
in the Township been assessed by uniform rules, then, by
applying the Director's ratio of 15.45%, the true value of
plaintiff's property would be in excess of $200,000"; that
the property "was not worth such sum." and plaintiff "was
the subject of discriminatory assessment" and was "being
required to bear a disproportionate and excessive share of
the taxes and tax burden of the Township."

I.

The appellants contend at the outset that the "mandatory
judgment to compel assessment on a true value basis con-
stitutes an abuse of legal discretion because such action is
likely to operate to the detriment rather than the benefit
of the public."

It is said in argument that, generally, *mandamus* issues
to "compel a public official to perform a ministerial act or
duty prescribed by law," to "compel the doing of a specific
thing," while here the purpose is to require the adoption of
a "course of official action," albeit a "course required by
statute and imposed upon the official by law," that would
call for the court's general supervision of "official conduct"

and in "numerous instances" a determination whether the particular officer has, "to the extent of his power, carried out the mandate of the court,"—in a word, a continuous superintendence of duty performance for an "indefinite time," involving a "general course of official conduct for a long series of continuous acts to be performed under varying conditions" and "recurrent yearly controversies as to whether the order has been complied with," a course alien to the nature of *mandamus*, citing 34 *Am. Jur., Mandamus, section* 74; *Hawkes v. Gates,* 129 *N. J. L.* 5 (*Sup. Ct.* 1942) ; and that there is the even more compelling "substantive reason," as distinguished from the "procedural" and the "discretionary," that the process is designed to remedy rather than promote a wrong, "to compel the performance of a duty which ought to be performed, not to direct an act which will work a public or a private mischief, or which will be within the strict letter of the law, but in disregard of its spirit," and may not be had "under the guise of enforcing a public right," "if in fact it will operate to the detriment rather than to the benefit of the general public, or cause great disorder and confusion in the fiscal affairs and duties of the officers of a public or *quasi*-public corporation," or if "public injury or embarrassment might" otherwise "result from the issuance of the writ," again citing 34 *Am. Jur., Mandamus, section* 35.

The reasoning denies the thesis that the "century old practices of assessors of assessing property at less than true value throughout the State can thus now," by this proceeding, "be readily remedied because tax assessors now have the tools at hand, through the data collected by the Director of the Division of Taxation, to achieve this objective," of which more hereafter; and it is said that "In considering the ramifications and complexities of the assessment problem," it is to be borne in mind that "widespread inequities are not confined to disparities in assessment ratios between the various taxing districts of each county, and between the individual property owners," and "Much greater dislocations in the economy of the State may result from the process

of equalizing disparities as between assessment ratios applied to different *classes* of properties by various municipalities," *e. g.,* "* * * it seems generally conceded that many urban municipalities traditionally assess industrial property at substantially higher percentages of value than residential property," sometimes explained, it is said, as a device employed by "urban municipalities * * * to delay, if not prevent, the gradual exodus of their residential population to the rural and suburban areas," in which category "probably falls the practice of assessing railroad property at 100% while using a different and lower percentage for other property," although, on the other hand, it has been said that "rural and suburban communities often seek to attract industrial enterprises from the cities through tax concessions."

Conceding such practices are indefensible, and "it would be folly to deny they have existed and have been tolerated," it is nevertheless insisted that it "would be dangerous to assume" that these usages "which have been embodied in tax policies can be removed without a violent shock to our economy," and the question raised is stated to be whether the "major surgery required to eliminate such wholesale inequities can be accomplished through judicial fiat, and whether, if it can be accomplished, this Court should undertake the task."

In none of the 567 municipalities of the State is real property assessed at full value. This is not a recent development; it has always been thus. And the Director of the Division of Taxation has found, as the result of a sales-price study, that the assessment ratio for 1956 ranges from a high of 70.8% to a low of 7.8%.

The generally accepted limitations upon the exercise of the ancient extraordinary remedy of *mandamus* obtain in New Jersey. It is a coercive process that commands the performance of a specific ministerial act or duty, or compels the exercise of a discretionary function, but does not seek to interfere with or control the mode and manner of its exercise or to influence or direct a particular result. *Mandamus* lies to compel but not control the exercise of

discretion. *Roberts v. Holsworth,* 10 *N. J. L.* 57 (*Sup. Ct.* 1828); *Benedict v. Howell,* 39 *N. J. L.* 221 (*Sup. Ct.* 1877). Unless the particular duty be peremptory, the fair exercise of judgment and discretion is the province of the functioning authority. The right of the relator and the public duty sought to be enforced must be both clear and certain. *Uszkay v. Dill,* 92 *N. J. L.* 327 (*Sup. Ct.* 1919); *Edward C. Jones Co. v. Town of Guttenberg,* 66 *N. J. L.* 58 (*Sup. Ct.* 1901), affirmed *Id.,* 66 *N. J. L.* 659 (*E. & A.* 1901); *Clark v. City of Elizabeth,* 61 *N. J. L.* 565 (*E. & A.* 1898). *Mandamus* issues "to compel the performance, in a specified manner, of ministerial duties so plain in point of law and so clear in matter of fact that no element of discretion is left as to the precise mode of their performance, but as to all acts or duties depending upon a jurisdiction to decide questions of law or to ascertain matters of fact, on the part of the officer or body at whose hands their performance is required, *mandamus* will not lie." *Mooney v. Edwards,* 51 *N. J. L.* 479 (*Sup. Ct.* 1889).

*Mandamus* is a legal remedy for the protection of purely civil rights. Time has worked changes in the early common-law concept of *mandamus* as a prerogative writ. The modern tendency is not to treat it as a prerogative writ save when invoked in matters of direct concern to the public, but as an ordinary writ of right to remedy official inaction. In New Jersey, prior to the adoption of the 1947 Constitution, the issuance of the writ ordinarily involved the exercise of a sound discretion; but in the enforcement of private rights the lawful exercise of discretion excluded mere caprice or arbitrary action and required that the rights of the parties in the particular case be declared and enforced according to law.

Yet, for the furtherance of essential justice, the allowance of the remedy of *mandamus* is governed by well-defined considerations of policy. The process issues to redress and not to promote a wrong; to command the performance of a duty which ought to be performed, not to coerce an act which will work a public or private mischief,

or will be within the strict letter of the law, but in disregard of its spirit. It may be refused where the result will be "disorder and confusion, * * * or where the rights of third persons will be injuriously affected"; and, controlled as it is by equitable principles, and by due regard to the public interest, *mandamus* will ordinarily be refused where compliance with the writ would "work a public injury or embarrassment, just as in its sound discretion a court of equity may withhold relief where it would be prejudicial to a paramount public interest." *Beronio v. Pension Commission of City of Hoboken,* 130 *N. J. L.* 620 (*E. & A.* 1943). See *McCormick v. City of New Brunswick,* 89 *N. J. L.* 117 (*Sup. Ct.* 1916). Although the remedy of *mandamus* is at law, "it may be refused for reasons comparable to those which would lead a court of equity, in the exercise of a sound discretion, to withhold its protection of an undoubted legal right"; and the court, "in its discretion, may refuse *mandamus* * * * to give a remedy which would work a public injury or embarrassment, * * * just as in its sound discretion, a court of equity may refuse to enforce or protect legal rights, the exercise of which may be prejudicial to the public interest." *United States ex rel. Greathouse v. Dern,* 289 *U. S.* 352, 53 *S. Ct.* 614, 77 *L. Ed.* 1250 (1933).

The essential nature of the extraordinary remedy of *mandamus* has not been altered by the 1947 Constitution. By *Article* VI, *Section* V, *paragraph* 4, prerogative writs "are superseded" and, "in lieu thereof, review, hearing and relief" shall be afforded in the Superior Court, on terms and in the manner provided by rules of the Supreme Court, "as of right, except in criminal causes where *such review* shall be discretionary." (Italics supplied) The writs themselves are superseded; but the substantive jurisdiction remains the same.

In historic perspective, the significance of the constitutional provision is clear. At the common law, until the statute of 9 *Anne, c* 20, the award or refusal of a peremptory writ of *mandamus* on the return to an alternative writ was not

reviewable on error, for reasons which need not be set down here. See *Kenny v. Hudspeth,* 59 *N. J. L.* 504, 527 (*E. & A.* 1896); also *Reg. v. Lambourne Valley R. Co., L. R.* 22 *Q. B. Div.* 463, 16 *Eng. Rul. Cas.* 788. By statute and the practice in New Jersey, the award or refusal of a peremptory *mandamus* was deemed discretionary and not subject to review on error unless, by a moulding of pleadings on an alternative writ, return and judgment, as in personal actions, the rights of the parties were determined, and then a writ of error would lie according to the course of the common law. *Kenny v. Hudspeth, supra;* for the practice, see *Silverthorne v. Warren Railroad Co.,* 33 *N. J. L.* 173 (*Sup. Ct.* 1868).

Save where the constitutionality of a statute was involved, *R. S.* 1937, 2:83–15, the award or refusal of a writ of peremptory *mandamus* on the return of a rule to show cause, and not by judgment on pleadings moulded under an alternative writ, was not reviewable on error or by the later appeal. *Trinkle v. Donnelly,* 98 *N. J. L.* 298 (*E. & A.* 1922); *Mannino v. Moffett,* 108 *N. J. L.* 545 (*E. & A.* 1932); *Layton v. State,* 28 *N. J. L.* 575 (*E. & A.* 1860); *City of Camden v. Public Service Ry. Co.,* 84 *N. J. L.* 309 (*E. & A.* 1913). The proceedings on *mandamus* were then "largely within the discretion and control of the court," and the court could "decline to hear the application for a writ unless in the alternative form, and the power of the court on the hearing of a rule to show cause and, after the decision, to direct an issue by proper pleadings to provide for a review by writ of error [was] unquestionable." *Clark v. City of Elizabeth, supra.* And the granting of leave to proceed to judgment by the alternative form also involved the exercise of judicial discretion. *Roberts v. Helrick,* 125 *N. J. L.* 633 (*E. & A.* 1941); *Piaget-Del Corporation v. Kulik,* 134 *N. J. L.* 147 (*Sup. Ct.* 1946); *Kenny v. Hudspeth, supra.*

Such was the character and quality of *mandamus* under the 1844 Constitution and before, although, as indicated in *Beronio v. Pension Commission of City of Hoboken, supra,* there was even then a tendency so to regard the proceeding

only when the subject-matter was of direct concern to the public, and otherwise as an ordinary writ of right.

So also, the allowance and refusal of the prerogative writ of *certiorari*, and the vacating of an *allocatur*, involved the exercise of judicial discretion not reviewable on error. *State v. Wood*, 21 *N. J. L.* 682 (*Sup. Ct.* 1847); *State v. French*, 24 *N. J. L.* 736 (*E. & A.* 1853); *Daniel B. Frazier Co. v. Long Beach Township*, 110 *N. J. L.* 221 (*E. & A.* 1933); *Post v. Anderson*, 111 *N. J. L.* 303 (*E. & A.* 1933); *Strobel Steel Construction Co. v. Sterner*, 128 *N. J. L.* 379 (*E. & A.* 1942), *certiorari* denied 317 *U. S.* 656, 62 *S. Ct.* 53, 87 *L. Ed.* 527 (1942); *Burlington County v. Martin*, 129 *N. J. L.* 92 (*E. & A.* 1942); *Staubach v. Cities Service Oil Co.*, 130 *N. J. L.* 157 (*E. & A.* 1943); *Gallena v. Scott*, 1 *N. J.* 430 (1949). No matter how meritorious the cause, the denial of the writ was final. It was the inadequacy of the state remedy that moved the federal court to take jurisdiction in *Hillsborough Township, Somerset County, N. J. v. Cromwell*, 326 *U. S.* 620, 66 *S. Ct.* 445, 90 *L. Ed.* 358 (1946).

And granting or refusing leave to file an information in the nature of a *quo warranto* also concerned the exercise of discretion not subject to review, although by statute it became a writ of right in certain cases. *State ex rel. Mitchell v. Tolan*, 33 *N. J. L.* 195 (*Sup. Ct.* 1868); *Clark v. Searing*, 70 *N. J. L.* 517 (*Sup. Ct.* 1904); *Conover v. Old*, 80 *N. J. L.* 535 (*Sup. Ct.* 1910); *Robibero v. Hillery*, 137 *N. J. L.* 96 (*Sup. Ct.* 1948); *Pellecchia v. Mattia*, 118 *N. J. L.* 512 (*Sup. Ct.* 1937). See *R. S.* 1937, 2:84–1; *N. J. S.* 2A:66–6. In short, the constitutional regulation concerns the right to invoke this extraordinary jurisdiction, but not the substantive principles governing the right to relief, such as, *e. g.*, the time-honored dictates of equity and the limitations imposed in the essential public interest. See *Evans v. Villani*, 19 *N. J. Super.* 86 (*App. Div.* 1952).

## II.

We come now to the ultimate question of the propriety of directing the local assessor to assess the taxable real property

of the municipality at "full and fair value" and at the price at which, in his judgment, such property "would sell for" at a "fair and *bona fide* sale by private contract on October 1st of the preceding year."

"All property real and personal" within the jurisdiction of the State, save as otherwise expressly provided, is subject to taxation annually "at its true value, and shall be valued by the assessors of the respective taxing districts," *R. S.* 54:4–1, as amended. The taxable personal property shall include "only tangible goods and chattels," except as otherwise provided by *R. S.* 54:4–20, 54:4–21 and 54:4–22. Omitted property is assessable by the county board of taxation. *R. S.* 54:4–47.

The local assessor is ordered to identify the owners of all real property situate in the taxing district, and to determine "after examination and inquiry" the "full and fair value of each parcel of real property * * * at such price as, in his judgment, it would sell for at a fair and *bona fide* sale by private contract" on the prior October first. *R. S.* 54:4–23, as amended.

The "tax on all tangible personal property," except as otherwise provided, "shall be assessed in and for the taxing district where the property is found." *R. S.* 54:4–9, as amended. The assessor "shall annually ascertain by diligent inquiry and by the oath of the persons to be assessed and others" the names of all the persons taxable in his district and the "true value of all the personal property therein." *R. S.* 54:4–12.

This standard of "true value" did not have its genesis in legislative discretion; it was a mandatory rule of action by force of the amendment to the 1844 Constitution adopted in 1875, *Article* IV, *Section* VII, *paragraph* 12, directing that "property" "be assessed for taxes under general laws, and by uniform rules, according to its true value." But now, by the 1947 Constitution, *Article* VIII, *Section* I, *paragraph* 1, it is ordained that property shall be "assessed for taxation under general laws and by uniform rules," and "All real property assessed and taxed locally or by the State

for allotment and payment to taxing districts shall be assessed according to the same standard of value," and "taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district."

But there has been no alteration in the peremptory statutory assessment criterion of true value. Yet the basic concept is the same. The dominant principle of the new constitutional mandate is equality of treatment and burden; and this was the genius and spirit of the old provision as well. The standard of true value is but a means of realizing uniformity and equality, the preeminent consideration in the apportionment of the tax burden in virtue of. the constitutional guaranties of due process and the equal protection of the laws. Were the rule of the State Constitution of a radically different import, the equal protection clause of the Fourteenth Amendment would prevail, for the right of equal treatment thereby secured protects the individual from state action making for discriminatory imposts not laid on others of the same class. *Baldwin Construction Co. v. Essex County Board of Taxation,* 16 *N. J.* 329 (1954). As there observed, one of the statutory provisions implementing the true value standard of the old Constitution, *R. S.* 54:3–13, enjoined the county board to "secure the taxation of all property in the county at its true value, in order that all [taxable] property * * * shall bear its full, equal and just share of taxes."

The framers of the 1947 Constitution had this basic principle in view. It is mathematical truth that in this regard there can be no essential difference between true value and a common ratio of true value applicable alike to all in the same class. In either event, the base is true value, and the assessments are in fact made according to the same standard of value. The question is whether there are variations of ratio making for substantial inequality in the distribution of the burdens of government violative of basic right. "Common" ratio imports equality in the incidence of the tax, the equality of burden that is of the essence of the constitutional precept. As said in *Baldwin,* the common assessment ratio was from the beginning given recognition

under the old constitutional and statutory standard of "true value." The direction for the assessment of property "under general laws, and by uniform rules, according to its true value," the standard laid down in the 1875 amendment to the 1844 Constitution, "requires, and is fulfilled by such regulations as should impose the same percentage of its actual value upon all the taxable property in the township for township purposes, in the county for county purposes, and in the state for state purposes." *Stratton v. Collins,* 43 *N. J. L.* 562 (*Sup. Ct.* 1881), Dixon, J. See *State Board of Assessors v. Central R. Co.,* 48 *N. J. L.* 146, 307 (*E. & A.* 1886), Dixon, J.

But this is not true of the "average" assessment ratio of true value, an arithmetical mean of varying ratios of true value, necessarily making for unequal proportions of value between the individual property owners and thus for the inequality of treatment and burden obnoxious to basic principle.

The general disregard of the full true value standard has given rise to problems that cannot be solved overnight. Sudden and drastic changes in the long-established practice could work great detriment to community fiscal life; the everlasting temptation to spend may be given free reign; and care must be taken that the *mandamus* process shall not be made the instrument of confusion and the unsettling of the local economy and even greater intra- and inter-county inequality.

The problem is now one of deep public concern. There is evident apprehension of harsh economic dislocation that may be averted by an orderly and systematic approach to the basic administrative deficiencies in the assessment process, such as are not remediable at one fell swoop but rather by specialized and considered judgment after full inquiry, bearing in mind the new constitutional principle of assessments according to the same standard of value.

The Legislature has taken cognizance of the essential fault and the public need, and is seeking for the remedy. December 20, 1956, a concurrent resolution jointly intro-

duced by seven Senators, Messrs. Jones, Dumont, Crane, Shershin, Forbes, Murray and Fox, was adopted by the Legislature requesting the Commission on State Tax Policy to "undertake a special study of the impact of enforced assessment of real property at 100% of its true value upon tax rates, the taxation of personal property, municipal and school debt limits, State aid formulas, special taxes based upon real property assessments, existing exemptions and general tax revenue requirements of counties and munici- palities," and to "report specially to the Governor and the Legislature its findings and recommendations for temporary, transitional and permanent changes, if any, in the entire State tax structure which the results of its study dictate to be desirable or necessary for equitable distribution of the total imposition of State and local taxes," not later than the first week of December 1957, and such interim reports "as its study shall dictate."

These are the recitals embodied in the resolution: "Recent developments relating to the taxation of real property in respect to the assessment thereof according to its value have again called attention to the imperative necessity for a re-examination of the state of the law upon this subject"; "Large numbers of the citizens and taxpayers of the State are deeply concerned over the potential requirement that assessments of real property be substantially raised in many taxing districts"; "Concern exists as to whether assessment of all real property throughout the State at full true value may create a redistribution of the tax burden not readily foreseen"; and "Many citizens and taxpayers have petitioned the Legislature to give consideration to the need for a revision of the statutory law in respect to the assessment of real property according to the standard of true value."

We respect these findings of the lawmaking branch of the government; the problem is basically legislative and ad- ministrative.

And, moreover, a hurried general assessment at full true value would not be conducive to common and individual right. A sales-assessment ratio study cannot for obvious

reasons be determinative of true value in the statutory sense. Furthermore, the market value is evidential but not the exclusive criterion; it is not the invariable test of true value. Special circumstances may "increase or depress market value without affecting true value or *vice versa*." *Harborside Warehouse Co., Inc., v. Jersey City,* 128 *N. J. L.* 263 (*Sup. Ct.* 1942), affirmed 129 *N. J. L.* 62 (*E. & A.* 1942); *Universal Insurance Co. v. State Board of Tax Appeals,* 118 *N. J. L.* 538 (*Sup. Ct.* 1937); *Newark v. Tunis,* 82 *N. J. L.* 461 (*E. & A.* 1911); *North Bergen Township in Hudson County v. Bergen Boulevard Holding Co.,* 133 *N. J. L.* 569 (*E. & A.* 1946); *L. Bamberger & Co. v. Division of Tax Appeals,* 1 *N. J.* 151 (1948). "Value for the purposes of taxation has some measure of permanency which renders it secure against general temporary inflation or deflation." *City of Newark v. West Milford Township,* 9 *N. J.* 295 (1952).

The sales-assessment ratio data do not provide the basis for an intra-municipal true value assessment of individual parcels of real property. Division Director Neeld, a perspicacious public servant in this intricate field of government, in an article published in *New Jersey Municipalities,* January 1956, *"The Gibraltar Case—Full True Value Assessments,"* affirmed that "Sales-assessment ratio data are usable for two basic purposes: a—To test the quality of the assessment roll of a district, and b—To approximate the aggregate true value of real property within a district for various apportionment purposes," and "are not intended nor considered to be useful for the purpose of making full value assessments against specific parcels of real property." He demonstrated that "* * * sales ratio data are [an] inappropriate source material for the development of assessment rolls on a full-true-value basis," for, he said, "in the taxing districts different classes of real property, such as vacant land, residential property, farm land and commercial and industrial property are assessed at different percentages of true value," and, moreover, "if a district's ratio is 20%, a multiplier of 5 applied to the aggregate assessed valuation will produce an approximate aggregate full true value for the district,

it does not follow that the application of such a multiplier to individual items will move the assessment on each property in the district to full true value," since this would be so "only in the event that each assessment was already at precisely 20% of true value," and the 20% in fact "represents merely the average ratio of assessed to true value of all of the properties on the roll which necessarily means that there are many with ratios far above and many with ratios far below this average," and while such data "will have value in aiding the administrative agencies to determine the existence of inequalities within a district, and may even assist the courts in dealing with cases involving alleged discrimination, nevertheless, such data cannot be employed as a substitute for the expertness, judgment and discretion required in formulating an original assessment for each parcel of property on a full true value basis."

The sales-assessment ratio data have been used for equalization by the aggregate method for the apportionment of county taxes among the municipalities, and the proportional distribution of state school aid. See *Gibraltar Corrugated Paper Co. v. North Bergen Township*, 20 *N. J.* 213 (1955); *City of Passaic v. Passaic County Board of Taxation*, 18 *N. J.* 371 (1955); *Borough of Totowa v. Passaic County Board of Taxation*, 5 *N. J.* 454 (1950).

Recognizing the complexities of inequality in the sharing of the tax burden, the public exigency, and the inadequacy of local assessing facilities, 99 of the State's municipalities have had professional "revaluations" made since 1950 of their taxable real property by outside specialists in the field and "new assessment rolls prepared," 20 taxing districts now have underway such "revaluation programs," as distinguished from "reassessment" procedures, and 15 others are about to engage in revaluation projects. This, according to a recent report of the Local Property Tax Bureau of the State, which declares also that "it is worthy of note that assessors in several districts have personally carried out extensive reassessments in an effort to eliminate inequalities to the best of their ability and judgment," but "(t)hese are

not considered a satisfactory basis for a revision of an assessment roll at a distinctly different ratio than is in effect at present." Newark, for instance, has contracts for this professional service at a cost in excess of $430,000. See *Alboum v. City of Newark*, 22 *N. J.* 571 (1956). By *L.* 1956, *c.* 48, *N. J. S. A.* 40:50–9, the municipalities are now empowered to enter into contract for the "preparation and execution of a complete program for revaluation of real property for use of the local assessor, * * *." Revaluation is not a mere arithmetical process.

Certainly, the court would not direct a *mandamus* to the assessors of the several municipalities who have undertaken a revaluation program; and the defendant municipality should not be treated differently, nor denied the time thus given to others for the same purpose. Yet we shall not vacate the judgment. The inquiry as to true value shall proceed, but the mandate otherwise shall not apply to the tax years 1957 and 1958, thereby to afford the Legislature the opportunity to take such measures and provide for such administrative procedures as its own inquiry may prove to be essential to the public interest, and to allow the Township time needed for the fulfillment of the project. It is shown that the municipality comprises 38 square miles and has 12,306 individually assessed properties, of which 800 represent new subdivisions, new buildings, and so on, and the directed "reassessment" would be an "obvious physical impossibility" within the time allotted.

Neither local debt limitations nor the impact upon revenue of assessments at true value in relation to the public utility gross receipts tax is of major concern in this inquiry, for the Legislature has full power to provide for an immediate adjustment of the particular statutes to the altered local economy. It is the magnitude of the task of revaluation and the danger of windfall inflationary spending that counsels so strongly against drastic and abrupt action—the likelihood of even greater discrimination by hasty and ill-considered assessments and the disposition to spend when "new" revenues are at hand, measured by the old tax rate, restrainable only

by a statutory tax ceiling or "freeze" in accordance with the old rate mathematically readjusted, a measure that could prejudice local fiscal action and work serious injury to the individual taxpayers and hardship in other directions, but one that at all events calls for the studied consideration of the legislative authority when all the facts and circumstances are known.

The readjustment will take time, but it should not be unduly prolonged; and so the inquiry as to true value should proceed meanwhile, for, whatever the ratio, the base of real property assessments for taxation is generally its value, and prompt action to this end will not be wasted effort or useless expense.

And the local authorities are admonished that the current assessment statutes, *ante,* place real and personal property in the one category, to be assessed at "true value." The assessment of real property at full value and tangible personal property at less would violate the statutory rule of equality. And we allude again to the element of inequality attending the fulfillment of the judicial mandate in but one municipality of the county, and the obvious need of joint action under the one standard by all such municipalities when the time arrives, requiring that they be made parties to the action, if need be to secure the requisite uniformity.

The plaintiff will have her remedy in the statutory tribunals for transgressions meanwhile of her right to equality of treatment.

And we find no need in these circumstances to direct the county tax board to perform its duty under the law.

The judgment is modified accordingly.

WEINTRAUB, J. (concurring). For more than a century our statutes have provided for equal taxation of real and personal property at true value. The *Constitution of* 1844, as amended in 1875, provided that "Property shall be assessed for taxes under general laws, and by uniform rules, according to its true value." *Art.* IV, *Sec.* VII, *par.* 12. Our present Constitution provides in *Article* VIII, *Section* I, *paragraph* 1:

"Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value; and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district."

Although this provision permits different legislative treatment of personal property from that accorded to real property and the use of percentage of true value as to real property, our statute still commands that real and personal property be treated alike and be assessed at true value. *R. S.* 54:4–1. There has been a century of wholesale disregard of these mandates. *City of Passaic v. Passaic County Board of Taxation*, 18 *N. J.* 371, 378 (1955). Municipalities vied for a lower percentage of true value to gain advantage in the allocation of the cost of county or regional government and in the distribution of state aid for schools, under both of which programs the edge was in favor of the taxing district with a lower ratio. In addition to this inter-municipal maneuvering, discrimination as among taxpayers within the taxing district has been characteristic. Broadly speaking, different percentages of true value have been evolved as to farm land, vacant land, dwellings, and commercial and industrial properties, reflecting local appraisals of ability to pay or other local interests. In the certain areas, largely urban, commercial and industrial properties have absorbed a higher tax burden than other classes of real property. In some areas the reverse is true, tax advantage having been used to attract enterprises which but for this preferential treatment would have located elsewhere to obtain the benefit of other economic factors.

The treatment of personal property has been too variant to admit of categorical statement beyond the notorious fact that because of like considerations and the inherent difficulty of ascertaining its *quantum* and value, even the kind of uniformity found in the case of real property is absent in the assessment of personal property, both within that class and in relation to the treatment of real property.

These are hard facts and local economies have been geared to them. And property having been bought and sold for generations upon the basis of reality rather than constitutional and legislative prescription, it is manifest that if all property were assessed in harmony with law there would be a windfall to some and hardship to others.

There has been nothing secretive about these local practices, although the extent of the deviations from law were not revealed in mathematical terms until fairly recent events. These facts were so evident that legislation has been enacted upon the premise of their persistence. Thus, the Legislature provided for distribution of state aid for schools upon tables prepared by the Director of the Division of Taxation upon his own findings of the average ratio of taxation in the municipalities. *Chapters* 85 and 86 of the *Laws of* 1954; *N. J. S. A.* 18:10–29.30 *et seq.; N. J. S. A.* 54:1–35.1 *et seq.* And more recently the statutory form of the local assessor's affidavit was amended so as to delete therefrom the statement that assessments were made on the basis of true value, an amendment which was enacted in response to assessors' demands for relief from possible criminal charges in the light of the mounting attention to the problem. *Chapter* 244 of the *Laws of* 1955, amending *R. S.* 54:4–36.

The other branches of government have been neither indifferent nor indolent. They inherited a problem they did not generate. "For over a century, legislatures, governors and public commissions have recognized the breakdown of the general property tax and have tried all the remedies of their day—but none have succeeded." *Sixth Report of the Commission on State Tax Policy* (1953), *p.* xvii. None among the humble will suppose his ukase would suffice. There is no easy solution for all the facets, but progress has nonetheless been made. The problem of intermunicipal competition has been fairly and substantially resolved. With respect to the distribution of state aid, the use of the Director's tables pursuant to the statute cited above has achieved essential equality. With respect to the distribution of the costs of county government, the Director's tables have

furnished the county boards with a tool for equalization of aggregates, and it is said that 20 of the 21 counties have either accomplished such equalization or are about there. Progress has been made with respect to the distribution of the costs of regional schools. See *Township of Berkeley Heights in the County of Union v. Board of Education of the Union County Regional High School District No. 1,* 23 *N. J.* 276 (1957); *Maplewood Township in County of Essex v. Essex County Board of Taxation,* 39 *N. J. Super.* 202 (*App. Div.* 1956).

It is the far knottier problem of equalization as among individual taxpayers as to which a solution has yet to be evolved. And it is that problem which the present case brings before us.

## I.

Plaintiff alleged that her land and dwelling were assessed for 1955 at $31,000; that the Director's tables reveal the average ratio of assessed to true value in the township to be 15.45%; and that on that basis the true value of her property must have been deemed by the assessor to be $200,647, whereas "The true value of plaintiff's properties in fact is substantially less than the value so computed." How much less she does not say.

Plaintiff did not make out a case of intentional, invidious discrimination against her. *Snowden v. Hughes,* 321 *U. S.* 1, 8, 64 *S. Ct.* 397, 88 *L. Ed.* 497 (1944). She alleged that the *Sixth Report made by the Commission on State Tax Policy* showed that in the tax years preceding 1953 residential real property in the township was assessed at 14% of true value and commercial and industrial real property at 18% of its true value. She charged further that on September 28, 1955 the Director of the Division of Taxation found the average ratio of assessed value to true value of real property in the township to be 15.45%. An affidavit on the motion reveals the Director's finding was based on the following data gleaned from 862 sales between July 1, 1954 and June 30, 1955:

| | Sample | Ratio Range | Average Class Ratio |
|---|---|---|---|
| Vacant land | 124 | 6.04% to 80% | 25.46% |
| Residential | 728 | 3.08 " 80 | 14.40 |
| Farm | 5 | 10.43 " 35.16 | 22.89 |
| Other | 5 | 10.10 " 30.97 | 12.67 |
| | 862 | Weighted Average | 15.45% |

The assessor in his affidavit averred "The said assessment which I placed upon plaintiff's property was made according to my best judgment as to the value of plaintiff's property in relation to the property in the area and according to the same standard of value used for other properties in the Township."

It was conceded before us that the assessor did not attempt to use full true value, but there is no proof or concession that he singled out plaintiff for disproportionate treatment. Insofar as we might be willing to conclude from the evidence that the assessor differentiated consciously between different classes of property, it would have to be said that residential property fared quite well, the average class ratio being considerably below that found as to vacant land and farm land and slightly above the category denominated as "other." The table of equalized valuations for 1955 shows that on the basis of true value the total valuation of "other" properties was $6,850,829 out of a grand total of $81,010,001.

With respect to "discrimination," the record as it stands would support at most a finding that plaintiff, to an extent not revealed, fared more poorly than some other property owners and perhaps did better than others, and not because of any invidious design as to her, but essentially because the assessment rolls got out of hand. This situation is not peculiar to Middletown township, but rather is typical, as the Director's tables show, of the situation in other municipalities. The reason is free of intentional wrong. Assessors have not kept and at the moment we may well assume they could not keep their rolls current with economic movements. The assessor, whose office perhaps is legislatively geared to an era which has passed and who in many cases is but a part

time official, finds to be monumental the duty to keep all property at any uniform valuation. There is no connection between that problem and the statutory mandate to use true value. The same discrepancies would exist whether the assessor sought to abide by full true value or any percentage of it, although the use of full true value would tend to magnify and thus to reveal more sharply the inequities which have unwittingly developed.

All agree that the Director's tables do not furnish ready aid to bring all properties up to either true value or any uniform percentage of true value. For example, the Director's finding of an average class ratio of 14.40% as to residential property is based upon sales which reflect valuations ranging from 3.08% to 80%. Hence if one should multiply the individual residential assessments as they now stand by the factor obtained by dividing 14.40 into 100, the result would not be equalization but rather the aggravation of existing discrepancies. Nothing short of complete revaluation of all parcels and some technique to keep them current will resolve the kind of "discrimination" which plaintiff's case reveals.

In this connection the application for a *mandamus* boils down to a prayer that the court order the assessor to do a more efficient job, wholly apart from any showing of a purpose on his part to do a poor one. And the inequity which plaintiff claims she experiences will be resolved, not by a command to think in terms of full value or any set percentage of it, but rather by a command to be more efficient, and indeed to make a complete revaluation, parcel by parcel.

A mere claim of inefficiency is hardly one which invites a judgment of *mandamus*. For relief from injustice flowing from inefficiency, plaintiff should be remitted to another remedy. The point of this extended discussion of the nature of plaintiff's true grievance is to clear this case of any notion that we are dealing here, on a complaint in lieu of the prerogative writ, with discrimination in fact resulting from willful disobedience of duty. Rather, the only complaint which is properly before us is that the assessor intentionally disobeyed a statutory command to think in terms of full true value.

I believe plaintiff may urge that complaint as a taxpayer and citizen even if she in fact is the beneficiary of the assessor's violation. 35 *Am. Jur., Mandamus,* § 320, *p.* 73. But a clear comprehension that plaintiff is seeking to vindicate that public right helps to indicate the course we should take.

## II.

It is urged the problem calls solely for an administrative solution, and hence we should decline to entertain the matter. I cannot concur in that view. It is appropriate and indeed the duty of the judiciary to lend its hand in the vindication of a public right. But although the right of plaintiff to be heard is constitutionally assured, *Art.* VI, *Sec.* V, *par.* 4, yet the right to relief depends upon the application of principles which control the granting of a *mandamus*. As is fully developed in the opinion of Mr. Justice Heher, *mandamus* will not issue where public harm or confusion may result.

The problem of equalization among taxpayers is far more complex than the problem of equalization of aggregates as among taxing districts. Let us view the setting in which we are asked to order peremptorily the assessment of all classes of real property at true value.

New Jersey is predominantly a property tax state. About 70% of all revenues, state and local, are derived from *ad valorem* taxation, and an even greater percent of all local revenues emanate from that source.

As stated above, discrimination among classes of property has been widespread, and properties have been bought and sold for generations on the basis of tax treatment in fact. What will be the impact of sudden uniform treatment of all classes of property? We cannot answer this question even as to Middletown Township on the basis of what little is disclosed in the record before us. It may be that the consequences of uniform treatment within the township itself may be taken in stride. But we must look beyond the township, because, as set forth below, the entire county is concerned and moreover since the precedent we establish here will apply

as well throughout the State, and we may assume that interests concerned await our opinion and will be energized into action by what we say here, we cannot omit to think in terms of statewide implications.

"New Jersey taxes on residences are almost double the national average." *Sixth Report of the Commission on State Tax Policy* (1953), *p.* xxiv. We know, for example, and hence cannot ignore it, that thousands of new homes have been purchased on a basis which to the buyer is the practical equivalent of a rental proposition in which the annual tax bill is a potent factor. What will happen to these purchasers and the owners of homes generally if the extra burden now borne by commercial and industrial real property is shifted to residential? In those areas in which industries were lured by gentlemanly understandings of tax preference, will they leave or stay, and if they leave, what will be the impact upon local economies built upon them?

Some utilities are taxed upon the application of the average rate of taxation upon their gross receipts in lieu of *ad valorem* taxation of certain properties. The average rate of taxation passed the $7.50 per hundred mark and by recent legislation a ceiling was placed at that figure and a floor at $5. *Chapter 268* of the *Laws of 1955* and *Chapter 15* of the *Laws of 1956; N. J. S. A. 54:31–50.* The total yield to local governments from this source in 1956 was $28,325,764. It has been estimated that if all property were assessed at full true value, the average rate of taxation would fall far below $5. What would happen to the municipalities concerned if they suddenly lost one-third of that revenue?

The statute commands that personal property be assessed at full true value, and as pointed out below, we are not free to ignore that command if we should decide to act. What will happen to commercial and industrial enterprises which doubtless in many instances have a local understanding and even without it pay on a basis far below true value? What of the resident, if his household effects should be assessed at full true value and thus be required to share equally the excess burden now placed elsewhere?

Class II railroad property is assessed at the state level for local use and in 1956 the yield was $14,363,933. The railroads claim the state assessor uses full true value while the municipalities which receive the proceeds tax the several classes of real property at varying rates, all below 100 percent. If this be a fact, what would happen to the residents of those municipalities if a portion of the differential were shifted to them by increasing their assessments to full true value?

There are other cognate problems. In theory, if all property were assessed at full true value, the individual tax bill in terms of dollars should remain the same. But men seasoned in public life assert that fact will not match theory, saying the reduction of the tax rate will encourage demands for greater expenditure which are now resisted by a forbidding tax rate. The borrowing capacity of local government is hinged to its total ratables. To lift them to full true value would, it is claimed, lead to pressures to borrow more. And if legislatively some standard other than full true value is prescribed for that purpose, what would be the impact upon the bonds or borrowing capacity of those municipalities whose total ratables are based on a percentage above the one selected? What technique will solve that dilemma?

I have posed a number of questions and answered none. The long and short of it is that we know enough to be wary, but not enough to know the answers. And the reason is evident. The record before us, and indeed the judicial process itself, are inadequate to ascertain the facts with respect to problems of such breadth. If we could resolve them by the stroke of a pen, I would gladly join. But for all I know we might be bulling through a china shop.

It is the obligation of the judiciary to refrain from peremptory action which may raise havoc with the public welfare. None of us is happy about the spectacle of a constitution or a statute ignored. But there is no appropriate whipping boy, neither the five million citizens of our State nor the assessors who fell heir to this extraordinary problem.

Although ultimately we must act, yet it is equally our duty to give our citizens a decent opportunity to seek an orderly solution of the manifold problems through their elected representatives or by constitutional amendment if they should conclude one to be necessary and desirable.

A proper handling of the problems will require initially an extensive fact-finding inquiry with respect to the matters suggested above and perhaps others of which I am ignorant, and thereupon the difficult task of conceiving solutions equitable to all in the light of conflicting interests. If a constitutional amendment should be thought to be necessary, there must be an opportunity to propose and vote upon it and then to legislate in the light of the decision at the polls. A complete revaluation of all property in the State will require outside expert assistance, and the opinion has been expressed that if all qualified appraisers in the country could be recruited, a number of years would be needed for completion of the work. It seems to me that in the light of all of these considerations, a minimum period of three years is needed, and hence that any order to assess at full value should not be operative for at least that period. I am not unmindful that in the interim some taxpayers will be paying more than they should pay according to the constitutional or statutory mandate. I will not stress the other side, that many of them bought at figures deflated by tax treatment in fact and that obedience to the statute means a matching inequity to others who also bought on the same basis. The larger consideration which to me is controlling is the welfare of the entire public which might be seriously invaded by peremptory action at this time.

## III.

Two other matters remain for consideration: (a) the cross-claim against the county board and (b) whether an order should include a direction to assess personal property at true value.

### A.

The initial question is whether the taxpayers of Middletown Township have an interest in the assessment practices in the other 50 municipalities of the county.

The individual tax bill reflects (1) the cost of municipal government and (2) the cost of county government (for present purposes I will omit any reference to school districts). Overall, the cost of county government represents about 20% of the total tax bills, being more or less than that percentage with respect to a given municipality depending upon the amount of municipal services and the cost thereof.

It seems clear to me that all of the taxpayers of a county are entitled to equal treatment with respect to the distribution of the cost of county government. Distribution among municipalities on the basis of equalization of aggregates of their respective ratables accomplishes a proper allocation of that cost *as among the municipalities,* and if equalization of the assessments within the Township of Middletown were achieved, each taxpayer of the township would bear his proper share of the cost of county government *as against other taxpayers of the township.* But, so far as the tax for county purposes is concerned, each taxpayer is entitled to equality, not merely as against other taxpayers within his own municipality, but also as against all other taxpayers of the county. It is no answer to say that the taxpayer is paying no more than his just share. He is entitled to enforcement of the legislative scheme that all taxable property be taxed equally for the purposes of county government. Just as plaintiff's right to such enforcement of the public duty within her township should be recognized whether she is bearing more or less than the share of the cost of local government which would be hers if the statute were complied with, so also there must be recognized the right of the owner of any property taxed for county purposes to seek enforcement of the statutory scheme for equality as among all amenable to taxation for county purposes. *Driscoll v. Burlington-Bristol Bridge Co.,* 8 *N. J.* 433, 476 (1952);

*Garrou v. Teaneck Tryon Co.,* 11 *N. J.* 294, 302 (1953); *Koch v. Borough of Seaside Heights,* 40 *N. J. Super.* 86, 93 (*App. Div.* 1956), affirmed 22 *N. J.* 218 (1956); *Haines v. Burlinglon County Bridge Commission,* 1 *N. J. Super.* 163, 171 (*App. Div.* 1949).

If the county tax were separately levied by the county itself, the right of each taxpayer to seek enforcement of the statutory scheme throughout the county would be apparent. If the county tax were thus directly distributed by county assessments ranging, let us say, from 3.08% to 80%, a taxpayer would not be denied the right to enforce the public duty merely because he happened to be paying the same number of tax dollars he would pay if uniformity had been achieved. If I am correct in this premise, then the right of a taxpayer of Middletown to relief as to the entire county with respect to the tax for county purposes should not be obscured and denied by the circumstance that the county tax is levied *via* municipalities and local assessors rather than directly by the county itself.

The defendants seem to be appropriate parties to assert representatively the rights of the individual taxpayers of Middletown. Hence I believe they are entitled to maintain a cross-claim to obtain relief with respect to the other municipalities upon a showing like the one which suffices for relief against them. I agree, however, that the county board is not the appropriate defendant to the cross-claim. The defendants should be the several assessors, for they are primarily chargeable under the statute, and realistically the county board has neither the time nor funds to accomplish individual reappraisals of all property. There is no suggestion that the county board would not perform its function within its means and practical opportunity if the local assessors performed theirs.

B.

Plaintiff did not seek assessment of personal property at true value. The question is whether the court should grant relief solely as to real property. I think it should not if

personal property is assessed below full true value, and no one seriously doubts that generally it is so assessed and in some instances not at all. *Sixth Report of the Commission on State Tax Policy* (1953), *p.* 9.

The statute calls for like treatment of both real and personal property. It is of no moment that the Legislature may constitutionally differentiate between the two. The Legislature has not, and the provision for true value as to which enforcement is sought appears only in the statute. In short, if *mandamus* is granted to compel assessment at true value, it will be the statute, not the Constitution, which is being enforced.

I do not seek to compel plaintiff to urge a right she may prefer not to assert. On the contrary, my point is that she may not ask the court to find and enforce a right different from the one she really has. Her right as a member of the public is to seek enforcement of the statutory plan and not some variation from it. She seeks a judgment which we know would establish and enforce a different policy, to wit, that real property shall bear a greater burden than personal property, for to assess all real property at full true value while personal property is assessed at a lower standard necessarily imposes a greater burden on real property than the Legislature has determined.

If plaintiff complained only of the failure to assess residential property at true value and sought a judgment limited to such property, surely no court would grant it .in the face of the fact that other classes of real property are assessed on a lower basis, for it would be manifest that the judgment would transfer to residential property some of the burden which belongs with other real property. The situation here presented is fundamentally no different. A difference may be found if we consult our private preference, but the policy is not ours to establish. The problem we now have resulted from precisely such determinations of preferences by local authorities. In *R. S.* 54:4–1 the Legislature plainly stated its policy that "All property, real and personal * * * shall be subject to taxation * * * at its true value, and

shall be valued by the assessors of the respective taxing districts." The assessor's duty to assess *all* taxable property at true value is single and indivisible, and it is that duty and only that duty which a litigant, speaking for the public, may seek to enforce. If a plaintiff alleged and proved that an assessor discharged that duty with respect to all but a portion of the taxable property and sought *mandamus* to compel performance as to such portion, relief so limited would be proper. But far different is a complaint which, as here, seeks not to have *all* taxable property assessed at true value but rather to have only a portion of such taxable property so assessed, and thus asks the court to join in creating a discrimination which the statute forbids. It is inconceivable to me that a court must aid in such discrimination at the bidding of a litigant. *"Mandamus* is a writ designed to remedy a wrong, not to promote one." 34 *Am. Jur., Mandamus*, § 34, *p.* 830. If the assessment of all taxable property at true value should be unpalatable (and doubtless it is), it would merely evidence the inappropriateness of *mandamus* as a remedy for these tax problems.

## IV.

The township did not seek to review so much of the judgment as ordered it to appropriate funds necessary to accomplish a revaluation, but the question which that portion of the judgment involves is too important to pass without at least an expression that our action does not impliedly constitute a determination of it.

The duty to assess is placed upon the assessor. *R. S.* 54:4–12, 23. It is his judgment which is required. I do not doubt his authority to accept such help as may be offered, but quite different is the question whether a court may compel him to seek outside assistance or order a municipality to provide it. The Legislature has authorized contracts and emergency borrowing for that purpose, *Chapter* 48 of the *Laws of* 1956, *N. J. S. A.* 40:50–9 *et seq.,* but has not ordered the municipalities to act. Since the question has not been

raised, briefed or argued, and is not necessarily involved in the appeal, we should express no view upon it.

The defendant assessor and the assessors who may be added as defendants to the cross-claim and as to whom a basis for relief is established may properly be ordered to start and proceed diligently to revalue all property, because information thus gathered would seem necessary under any solution of the problem. But any time limitation for completion must take into account the need for proper revaluation. There is no point in compelling such haste that the end product will be characterized by new inequities.

■ Mention should be made of the objection that since appraisal involves judgment and discretion, it may not be judicially ordered. The difficulty is enlarged by suggesting that upon contempt proceedings liability might depend upon varying views in an area in which experts are prone to disagree. Although on *mandamus* the end result of an exercise of discretion may not be controlled, it is equally clear that a public official may be compelled to exercise that discretion. 34 *Am. Jur.*, *Mandamus*, §§ 67–8, *pp*. 855–8; see *Reid Development Corporation v. Township of Parsippany-Troy Hills*, 10 *N. J.* 229 (1952) ; *Gallena v. Scott*, 11 *N. J.* 231 (1953). Where, as here, it is conceded that the assessor made no effort to assess at true value, he may be ordered to perform the statutory duty, that is, to undertake in good faith to assess at what he believes to be the true value of the property, without, of course, attempting to control the result he reaches in a *bona fide* appraisal.

**V.**

Accordingly I would reverse the judgment except as to the county board and remand the cause to the trial court with these directions:

1. To inquire as to whether personal property is assessed at true value, and if it appears that it is not, to permit plaintiff to amend to seek relief with respect to both real and personal property, and in default of such amendment to dismiss the complaint.

2. To permit defendants to amend the cross-claim and to add the assessors of the other municipalities in the county (and the municipalities if defendants should see fit so to do).

3. Upon a finding that the assessors have not sought to assess at true value, to order them to proceed diligently and in good faith to revalue all taxable property, real and personal, at full true value.

4. To order the assessment of all such property at full true value simultaneously upon completion of the revaluations by all assessors in the county (if they are added as parties defendant on the cross-claim and a basis for relief is found), but in no event should such direction be effective prior to assessment for the year 1960.

5. To retain jurisdiction of the cause for such modification or further order as circumstances may justify.

\* \* \* \* \* \* \*

None of the divergent views within the court has mustered a majority. Three members of the court agree upon a result different from the one I prefer and yet not too distant from it. To the end that there may be majority action, I will concur in the result they reach in the opinion by Mr. Justice Heher.

WACHENFELD, J. (dissenting). The query here is whether or not we will sustain the direction of the Superior Court, by way of writ of *mandamus,* in substance compelling the defendant assessors of the Township of Middletown to value and assess all taxable real property at 100 per cent of true value.

The matter complained of is admittedly "not a recent development; it has always been thus." As a matter of fact, the existing practice is more than a century old.

In its sweep, the majority opinion also includes tangible personal property, which was not made an issue or even mentioned in the pleadings before us. No one has yet been given an opportunity of arguing or presenting the matter to us. There are millions of property owners throughout the State who have had no notice of this issue and are totally

unconscious of its existence. They will awake tomorrow, however, to find themselves substantially affected, not by anything their elected representatives did but by a judicial decree on an issue not even a part of the litigation presently being considered.

Rendering a vital judicial adjudication without representation or notice is contrary to our customary concept of fundamental justice.

Although the majority says "care must be taken that the *mandamus* process shall not be made the instrument of confusion and the unsettling of the local economy and even greater intra- and inter-county inequality," it then proceeds, in the face of its own cautionary warning, to direct the judgment below to stand and merely postpones its effective operation for a period of time.

The majority concludes "the problem is *basically legislative and administrative*" and then inconsistently proceeds to solve it judicially. (Emphasis supplied)

█ The remedy by *mandamus* is a process, as outlined by the majority, which "issues to redress and not to promote a wrong" and it will "be refused where the result will be 'disorder and confusion, * * * or where the rights of third persons will be injuriously affected'" and is "'largely within the discretion and control of the court.'"

What may occur by reason of this decision is adumbrated in the Chief Justice's dissenting opinion, where he strives valiantly to overcome the anticipation of chaotic upheaval and injury to the taxpayer. He notes the "fears" that the drastic change "could work detriment to the economic and community fiscal aspects of life in this State" in "chasing away of the industry and the imposition of the burden borne by it upon the residential property, principally the small home owner" and "the temptation, in anticipation of increased revenues."

He then concludes: "But there can be no windfall to the governing body of the municipality at the expense of its taxpayers." I am hoping this is more than wishful thinking, but a practical and realistic approach reflects unusual

jeopardy for the taxpayer. The tax structure and mechanism are extremely complicated, and I do not think this court can even begin to visualize and appreciate the far-reaching effects of its decision. Aside from the ensuing inflation of borrowing power which perhaps only the Legislature has the right to control, Director Neeld in *"The Gibraltar Case—Full True Value Assessments,"* January 1956 issue of *New Jersey Municipalities,* stresses that full true value assessments will have the effect of seriously reducing the Public Utility Gross Receipts Tax and disrupting the tax structure with respect to the prevailing spread between real and personal property. He says:

"In view of the magnitude and complexities of the problem and the dangers of precipitate action, the Legislature may deem it desirable to review the entire field of local property tax administration through a Legislative Commission."

Even though it is "legislative and administrative," in essence, the court nevertheless brings about the drastic change and there is little the taxpayer can do about it now. The majority is so fearful of the resultant harm it postpones the enforcement of its decree for three years, hoping to be rescued from its own decision by the Legislature in the meantime.

It speaks of "the danger of windfall * * * spending," "the likelihood of even greater discrimination by hasty and ill-considered assessments," "the disposition to spend when 'new' revenues are at hand," and of "a measure that could prejudice local fiscal action and work injury to the individual taxpayers and hardship in other directions."

Despite these fears, all well grounded and reasonably to be expected, and with a final wailing lament, "we allude again to the element of inequality attending the fulfillment of the judicial mandate," they affix the judicial seal which may well bring about all the dire things of which they are so apprehensive.

The dictation of the majority, in my opinion, trespasses upon the heart of our constitutional concept of separation of powers among the coordinated branches of government.

While it is true that the statutes require by their terms assessment of property at true value, the admitted and undisputed fact remains that neither the local tax assessors, the county boards of taxation, the Director of the Division of Taxation, nor the Division of Tax Appeals has ever undertaken to enforce the statutory mandate to its full magnitude, although they have the complete equipment and the full power to do so. As it now exists, the practice has continued ever since the true value standard was written into the Constitution of 1844, *Art.* IV, *Sec.* VII, *par.* 12, as amended, effective September 28, 1875.

It is hardly the province of this court to sweep away almost a century of precedent in an area which it admits is "legislative and administrative" and constantly under the surveillance of and wholly subject to the legislative processes. Judicial discretion, if not constitutional mandate, warns us not to transgress upon a matter which is so wholly legislative. Our critics, who insist we have usurped legislative and executive functions heretofore, will find substantial and added comfort from this new judicial effort.

The majority recognizes the legislative, together with the executive, branch is presently studying a contemplated revision of true value standards and the administrative machinery for determining and fixing assessments. Whatever changes result will be made by those who are properly empowered to deal with questions affecting all of the people of the State, and it does not behoove us to decide now a matter which they want further time to study. The people have recourse from their conclusions; none from ours.

I would reverse the judgment below and deny the writ.

With this dissenting opinion goes a fervent prayer that its fears, projections and reflections will prove to be completely wrong and that the taxpayer is not to become a sacrificial lamb by judicial fiat and that there will henceforth be equitable equality of tax burdens which we all hope for.

Tomorrow we shall see.

618

VANDERBILT, C. J. (dissenting).

## I.

### BACKGROUND

By 1875 the unfairness of taxation in New Jersey had reached the point that a constitutional amendment was passed by two successive Legislatures and adopted by the people "at a special election to be held for that purpose only * * * *by a majority of the electors qualified to vote for members of the legislature voting thereon."* The amending process under the former *Constitution of* 1844 was indeed difficult of accomplishment, *Const., Art.* IX, but the need for relief from inequitable taxation was deemed overwhelming. The amendment was simple and seemingly unambiguous:

"Property shall be assessed for taxes under general laws, and by uniform rules, according to its *true value.*" (*Art.* IV, *Sec.* VII, *par.* 12, as amended, effective September 28, 1875; all italics supplied)

All the statutes passed pursuant thereto as well as under the corresponding provision of the *Constitution of* 1947 (to which I shall refer in due course) have uniformly adhered at every level of the taxing machinery—municipal, county and state—to the standard of *true value* ordained by the *Constitution of* 1844. These statutes are still the governing law of New Jersey, *N. J. S. A.* 54:4–1 at the local level; *R. S.* 54:3–13 and *N. J. S. A.* 54:4–47 at the county level; and *N. J. S. A.* 54:2–39 at the state level. It is difficult to conceive of a standard of assessment for taxation more simple or more fair than the standard of assessment at true value.

Yet from 1875 until the present day the very obvious will of the people has been frustrated, notwithstanding the fact that the great increase of government expenditures in the present era of large governmental operations has entailed vast increases in taxation. This unfortunate breakdown in the enforcement of the 1875 amendment has been due, first,

to the narrow judicial construction as to the right of a taxpayer to avail himself of the clear popular mandate for taxation at true value, *Royal Mfg. Co. v. Board of Equalization of Taxes,* 76 *N. J. L.* 402 (*Sup. Ct.* 1908), affirmed 78 *N. J. L.* 337 (*E. & A.* 1909); second, to the complicated and ineffective taxing machinery at the local, county and state levels; third, to the long-continued failure of the municipal assessors throughout the State to comply with the *Constitution of* 1844 and the controlling statutes; and fourth, to the failure of the county taxing authorities to supervise the work of the local assessors except through the mechanical equalization of aggregates within a county which reaches only a small part of the widespread and almost universal inequities in the administration of the tax law. Whatever hope there was of obtaining compliance by the local tax assessors of their statutory obligation to assess at true value was diminished when the Legislature as late as December 19, 1955, *L.* 1955, *c.* 244, repealed *N. J. S. A.* 54:4–36 requiring each assessor to annex to his assessment list an affidavit stating among other things:

"I, * * * do swear (or affirm) that the foregoing list contains the valuations made by me to the best of my ability, of all the property liable to taxation in the taxing district in which I am the assessor, and that I have valued it, without favor or partiality, *at its full and fair value,* at such price as in my judgment it would sell for at a fair and *bona fide* sale by private contract on October first last * * *."

The local assessors are politically elected or appointed officials, many of them part-time workers, incapable of doing the work of taxing experts. Most of the county boards of taxation are not properly financed to do the work the statutes require of them. Only at the state level has the Director of the Division of Taxation attempted to ascertain true value by the systematic assembling of sales data, primarily for the purpose of apportioning state aid to schools, but incidentally for the benefit of the county boards of taxation in their mechanical equalization of assessments in the various municipalities of each county. To understand the present

deplorable state of affairs the decision in the crucial case of *Royal Mfg. Co.*, above referred to, must be understood, because it is to a large extent the cause of our present difficulties. There it was held that a taxpayer whose property is not assessed at more than true value has no standing to complain, because under the 1875 amendment to the former Constitution all property must be assessed at true value, and that even if he was discriminated against in favor of other taxpayers, he could not have his assessment reduced, but rather must seek to raise the assessments that were lower than his. This legalistic decision placed on the individual taxpayer the intolerable burden of proving the true value of each property in the municipality—a burden which he could not possibly hope to meet by reason of the sheer expense of such a suit. This unfortunate decision not only ignored the realities of the taxing process; it ushered in the era of what the public and the press, when its possibilities came to be understood, quite properly called "tax lightning." The Commission on State Tax Policy euphemistically but graphically expressed the existing situation in its *Fifth Report* (1950; *p.* 4):

"The administration of the general property tax (real estate and improvements) is a chaos. On the business side it is a matter of *a more or less gentle bargaining process* that over the years has *created a host of insecure but 'favorable' conditions.*"

This statement is documented with complete county by county tables in its *Sixth Report* (1953; *p.* 30). At *page* 27 the Commission summarized its findings as follows:

"Real estate in New Jersey is assessed at an average assessment ratio of 34 per cent of its value. On this basis, the State-wide average tax rate of $6.77 per $100 valuation taxable in 1952 represents an average effective tax burden of $2.30 per $100 of full value.

The estimated average assessment ratios vary as among the 21 New Jersey counties from a low of 16 per cent in Ocean County to a high of 56 per cent in Hudson County. Six of the State's 21 counties show estimated average assessment ratios above the overall State-wide average of 34 per cent and three of them (Hudson,

Essex and Passaic) show estimated average assessment ratios above 40 per cent. On the other extreme, four counties (Ocean, Burlington, Sussex and Salem) show estimated average assessment ratios of under 20 per cent.

The variation as among individual municipalities ranges from estimated average assessment ratios *under 10 per cent in seven municipalities to over 60 per cent in two municipalities.*"

Its conclusion (*p.* 133) as to the inequities of taxation throughout the State seems inescapable:

"*Never has so much money been raised from so many people so inequitably as in the current administration of the local tax on real estate.*"

Here we have conclusions of fact documented by years of competent study by an official commission that we cannot afford to ignore in the consideration of such vital issues.

The only relief that has been accorded aggrieved taxpayers in New Jersey has come, not through the 1875 amendment, but by virtue of the equal protection clause of the Federal Constitution in the *Hillsborough Township, Somerset County, N. J. v. Cromwell* case, 326 *U. S.* 620, 66 *S. Ct.* 445, 90 *L. Ed.* 358 (1946), in which the inadequacy of the *Royal Mfg. Co.* case was adversely commented upon by the United States Supreme Court. In this case the tax collector of a small New Jersey community with total assessed valuations for all property, both real and personal, of $3,139,020, levied assessments in the amount of $221,940,438 upon the intangible property belonging to an individual resident and to a trust of which she was trustee. This assessment would have resulted in additional tax payments of nearly $7,000,000 per year as compared with the township's annual budget of approximately $97,000, an outrageous instance of "tax lightning" which had become prevalent in various parts of the State. In that case the United States Supreme Court, which seemed more aware of the economic and political realities of taxation than our courts at that time, correctly criticized the *Royal Mfg. Co.* decision for failing to accord the taxpayer the protection to which he was entitled under the Federal Constitution:

"The equal protection clause of the Fourteenth Amendment protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class. The right is the right to equal treatment. He may not complain if equality is achieved by increasing the same taxes of other members of the class to the level of his own. The constitutional requirement, however, is not satisfied if a State does not itself remove the discrimination, but imposes on him against whom the discrimination has been directed the burden of seeking an upward revision of the taxes of other members of the class. *Sioux City Bridge Co. v. Dakota County*, 260 *U. S.* 441, 445–447, 43 *S. Ct.* 190, 191, 192, 67 *L. Ed.* 340 \* \* \*; *Iowa-Des Moines Nat'l Bank v. Bennett*, 284 *U. S.* 239, 247, 52 *S. Ct.* 133, 136, 76 *L. Ed.* 265; *Cumberland Coal Co. v. Board of Revision [of Tax Assessments]*, 284 *U. S.* 23, 28, 29, 52 *S. Ct.* 48, 76 *L. Ed.* 146. The courts of New Jersey in a long line of decisions have held that a taxpayer who has been singled out for discriminatory taxation may not obtain equalization by reduction of his own assessment. His remedy is restricted to proceedings against other members of his class for the purpose of having their taxes increased. The rule was stated in *Royal Mfg. Co. v. Board of Equalization [of Taxes]*, 76 *N. J. L.* 402, affirmed in 78 *N. J. L.* 337, as follows: '\* \* \* the county boards are required to secure taxation of all property at its true value; so that the fact that the property of A is assessed at its true value, and the property of other taxpayers within the same district is assessed below its true value, affords A no ground for demanding a reduction of his valuation, though it does entitle him to apply for an increase in the valuation of the others.' 76 *N. J. L.*, at *pages* 404, 405. On the basis of that rule it is plain that the state remedy is not adequate to protect respondent's rights under the federal Constitution." (326 *U. S.*, at *pages* 623–624, 66 *S. Ct.*, at *page* 448.)

Had our courts applied the same reasoning and the same requirements of proof in the *Royal* case, the 1875 amendment and the implementing statute would have been quickly complied with by the taxing authorities.

The doctrine of the *Royal* case was not put to rest in this State until the decision of this court in *Baldwin Construction Co. v. Essex County Board of Taxation*, 16 *N. J.* 329 (1954); see *Gibraltar Corrugated Paper Co. v. North Bergen Township*, 20 *N. J.* 213 (1955), at *page* 219. Meanwhile the evil of unfair taxation multiplied. There is inequity among the municipalities of a county, only partially overcome by the equalization of aggregates; there is inequity in many municipalities among different types of property; and there

is-the greatest of inequity among individual taxpayers owning the same type of property within a municipality, neither of which evils is reached by the equalization method.

In these days of bulging taxes at all levels, the matter of taxation naturally came before the Constitutional Convention of 1947, which labored with the problem, deleted all reference to taxation at true value, and came forth with a new expression of tax policy:

"Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value; and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district." (*Const.* 1947, *Art.* VIII, *Sec.* I, *par.* 1)

Over nine years have passed since the adoption of the new Constitution, but the new provision has not been availed of by the Legislature. The taxation statutes still call for assessments at true value, *N. J. S. A.* 54:4–1, *R. S.* 54:3–13, *N. J. S. A.* 54:4–47 and *N. J. S. A.* 54:2–39, *supra,* but the violations of these statutes are just as universal and rampant as they ever have been. The Legislature has never attempted to utilize the constitutional provision of 1947, above quoted, but on the contrary submitted a proposed constitutional amendment to the people last year (1956) on the subject of taxation which would have added to the present *Art.* VIII, *Sec.* I, *par.* 1 the following sentence:

"The Legislature may authorize the governing body of any municipality constituting a taxing district to establish a proportion of the standard of value at which such real property situate therein shall be assessed, and such proportion shall be uniformly applied to all such real property within the taxing district." *Assembly Concurrent Resolution No.* 36. Filed July 17, 1956.

In a release dated November 2, 1956, the New Jersey Commission on State Tax Policy opposed the adoption of such an amendment saying:

"ACR 36 is intended to head off the effects of an anticipated decision of the State Supreme Court affirming the appellate division

decision in *Switz v. Middletown Township*. That decision requires assessors to follow the existing law by valuing property at 100 per cent of true value. If the Legislature considers a lower percentage appropriate it has only to amend the statutes, not the Constitution."

\* \* \* \* \* \* \* \*

"\* \* \* the Commission would emphasize that it would be a mistake, from the viewpoint of the long range development of a sound tax system in New Jersey for the people to approve the amendment of the Constitution proposed by ACR 36. All of the proper objectives of this proposal can be accomplished by legislation. The amendment of the Constitution, on the other hand, would create vested interests in the bad practices of the past. The proposal has little merit beyond an easy and temporary method of avoiding statewide equalization on full value assessments, and can result in nothing more than an extension of the past century of inequities."

This proposed amendment was rejected by the people at the polls, *Minutes of the Board of State Canvassers, Department of State,* December 4, 1956, *page 7,* some claiming that it meant one thing and would produce one result, and others claiming that it meant quite another and would produce a different result. Clarity is the great prerequisite of any tax law, and in this State in view of our experience under the 1875 amendment that clarity must be such that the courts cannot misunderstand or misconstrue; see 2 *Sutherland Statutory Construction* (3d ed.), *page 334,* where the author observes:

"It is not allowable to interpret what has no need of interpretation."

The mounting pressure of taxation has led to a renewal of litigation to achieve assessment at true value, where heretofore procedural reasons have been advanced to deny relief; see *Baldwin Construction Co. v. Essex County Board of Taxation, supra,* 16 *N. J.* 329 (1954), where the court held that it was bound by the nature of the proceeding brought which sought only to review the action of the tax board and refused to give effect to the requirement of true value because to do so would result·in relief in the nature of *mandamus* bearing on the future performance of statutory functions

that had not been sought by the pleaded cause; see also *Gibraltar Corrugated Paper Co. v. North Bergen Township,* 20 *N. J.* 213 (1955), where the court at the behest of the complaining taxpayer reduced the taxes from true value to the level set by the standard used in assessing other properties in the municipality. The difference between that case and the instant case is that here the taxpayer is asking to have the property taxed at true value pursuant to the statute.

## II.

### THE PENDING CASE

Now for the first time we are confronted with a simple suit by a taxpayer of a municipality directly attacking the assessments in the municipality as being at less than true value and seeking to remedy discriminatory and unfair taxation resulting therefrom by forcing general compliance with the command of the statute to assess at true value. The case has gone through the Law Division of the Superior Court and the Appellate Division of that court. Meantime the defendant municipality has undertaken a reappraisal according to true value of all of the property within the municipality, and we have been advised that that reappraisal has now been completed.

Thus, the case as between the plaintiff-taxpayer and the defendant-municipality and its tax collector is now ripe for decision. To delay decision in the instant case and to permit the inequities of taxation that have existed in the Township of Middletown to continue because some other municipalities have refused to see the handwriting on the wall, as the majority and concurring opinions do, cannot be justified. Incidentally, we are told in the majority opinion that 99 municipalities have undertaken professional revaluation programs in anticipation of enforcement of assessments at true value and 15 more are contemplating such action, but such proceedings, either undertaken or contemplated, constitute no reason for withholding action in favor of the aggrieved taxpayers of the Township of Middletown while we are awaiting either revaluation programs in the remaining municipalities of this State,

or a new taxation program from the Legislature. The decision of this case in favor of the plaintiff does not bind any other municipality in the State, though it would, of course, serve notice as to the necessity of their complying with this statute directing assessment of property at true value.

The majority of the court fear that a decision in favor of the plaintiff, effective now, would upset the economy of the State. To my mind this is attributing to a judgment in favor of the plaintiff, effective now, after a revaluation has been completed in the township, a fanciful result, which in the meantime deprives the plaintiff and other similarly situated taxpayers of their undeniable right to immediate fair treatment. The situation in every other municipality would still require decision on the basis of the facts of its particular case, if it comes before the courts.

The majority and concurring opinions concede that in principle the plaintiff is entitled to relief and they acknowledge that conformity with the statutory plan is much to be preferred over the present state of affairs. Yet, because none of our 567 municipalities (except Princeton Township alone) assess at true value at the present time and because of their "fears," they have elected to excuse non-compliance with the law by the defendants and thus compound the pernicious effects of disregard of the statute. They are afraid that any sudden and drastic change in the established practice could work detriment to the economic and community fiscal aspects of life in this State; that in the areas where it is said "industries were lured by gentlemanly understandings of tax preference," forced equality of treatment may result in the chasing away of the industry and the imposition of the burden borne by it upon the residential property, principally the small home owner; that there will be the temptation, in anticipation of increased revenues, to yield to the desire to obtain those things which have been thought necessary but heretofore unobtainable because of the lack of the wherewithal to purchase them; that a rapid unconsidered transition from failure to comply with the law to compliance

with the law will create new conditions not "conducive to common and individual right"; that to order fulfillment of the statutory mandate in but one municipality is to increase the inequities that already exist; that the resulting increase in the debt limitations caused by sudden increases in the aggregate valuations will "lead to pressures to borrow more" and that the measures adopted to alleviate these conditions may result in even greater problems.

There is nothing in the record or in the facts before us to justify these fears of the majority, once the court realizes (1) that the decision of this case concerns only Middletown Township and its inhabitants, and (2) that if any other municipality has some special equity that Middletown Township does not have as to the time when its assessments shall be made at true value, it may assert its peculiar equity when its case comes on for hearing. Any peculiar situations in other municipalities are not at all related to the problems of Middletown Township and cannot be permitted to interfere with the decision in its case. The Township of Middletown has undertaken the reappraisal of all of the property within its borders at true value pursuant to the governing statutes. Without any outside help it has completed all but 25% of the reappraisals and under legal advice is prepared to apply a formula to the balance of the properties to bring those appraisals to an estimated level of true value and thus be in a position to comply forthwith with any judgment of this court requiring immediate assessment at true value. It is, however, now awaiting the judgment of this court before actually assessing all of the property in the township. Meantime, the township has not filed its assessments with the Monmouth County Board of Taxation, although we have been assured that they are in a position to do so forthwith, with the result that the County Board of Taxation has been unable to strike a county tax rate or to readjust the aggregate ratables among the municipalities in the county based on the actual assessments for the Township of Middletown. The failure of this court to decide in the pending case to order immediate compliance with the statutory standard is thus

not only interfering with the orderly course of taxation in the Township of Middletown but throughout the county as well. The instant case is obviously ripe for decision.

The majority are concerned with an imaginary possibility that in the year of transition from the old order to the new system of assessments at true value more taxes may be raised than were provided for in the budget of the municipality. But there can be no windfall to the governing body of the municipality at the expense of its taxpayers. The present statutes safeguard the citizens against such a contingency. The Local Budget Law, *R. S.* 40:2–1 *et seq.* requires that every municipality adopt a budget for each fiscal year, *R. S.* 40:2–5, and to state in it the "amount to be raised by taxes," *R. S.* 40:2–13 and 15. This budget upon adoption constitutes "an authorization of the amount to be raised by taxation for the purposes of * * * the municipality," *R. S.* 40:2–11. The grant of power by the Legislature "to assess, levy and collect taxes" is granted solely for the purpose of supporting "any budget adopted" pursuant to statute "and for all other *lawful* purposes," *R. S.* 40:2–19; see also 40:48–7. Once the budget is adopted, *R. S.* 40:2–8, the amount required for public purposes in a particular year has been determined, and except in extraordinary cases it cannot be altered, *R. S.* 40:2–8, *supra, R. S.* 40:2–9, 40:2–20. The intent of the law is that the receipts, including taxes, in that year should equal the authorized appropriations of the budget. The scheme provided for by statute is that the amount of money required for the public purposes of the municipality be first proposed and fixed and determined after a public hearing, at which the people affected have an opportunity to voice their opinions, *R. S.* 40:2–6; that the tax rate then be computed by dividing the amount called for by the budget by the gross or aggregate value of the assessments. Thus, the total amount of ratables of a municipality for the particular year in question, multiplied by the tax rate, should equal the amount authorized for public purposes by the budget, *R. S.* 54:4–48. If the assessment of properties in a municipality at true value is completed

and approved prior to the adoption of the budget, as in the usual course it would be, *R. S.* 54:4–42, *R. S.* 40:2–10, the new tax rate will reflect the change caused by assessment at true value, *R. S.* 54:4–48, *supra*. If, however, an increase in the gross value of the ratables in a municipality is caused by assessments at true value after the tax rate is fixed and determined for a particular year based on less than true value assessments, the amount of taxes that would actually be raised would be grossly disproportionate to the amount required by the adopted budget to be raised by taxation and therefore unauthorized.

Protection against any undue inflation of the borrowing power of a municipality is already given by the provisions of the Local Bond Law, *L.* 1935, *c.* 77, where the debt limit provided for is based upon the average of "the three next preceding assessed valuations of taxable real property" of a municipality, *R. S.* 40:1–15 and 16, *R. S.* 40:1–80 and 82. This would give the Legislature until the session of 1958 to adjust the statutory debt limits, if any adjustment is necessary. As to the years following the year of transition, the taxpayers have it within their power to voice their opinions to their elected representatives as to how much municipalities should spend. The real interest of the taxpayers is in the number of dollars they will be called upon to pay in taxes rather than in the rate at which they are to be taxed and as to the future, as it does today, public opinion and law will protect the people from unconscionable burdens.

## III.

### PROCEDURE

The majority opinion goes into an elaborate review of the law of the former remedy of *mandamus* and seeks to justify its position with the theme that *mandamus* will be refused when it would promote a wrong rather than redress one, where "the result will be 'disorder and confusion,' " when it would "work a public injury or embarrassment" and where it would "coerce an act which will work a public

or private mischief." But none of the cases or authorities relied upon state any principles that would serve to prevent the immediate granting of the relief sought by the plaintiff here. The duty sought to be enforced—the assessment of all property at true value according to the statutory command—is a peremptory one and meets the test of being "so plain in point of law and so clear in matter of fact that no element of discretion is left as to the precise mode" of performance set forth by the authorities cited by the majority. *Mandamus*, along with the other prerogative writs, was superseded by the 1947 Constitution, *Art.* VI, *Sec.* V, *par.* 4, and in lieu thereof relief as of right has been afforded in civil cases by action in the Superior Court, *R. R.* 4:88. This provision of the Constitution not only swept aside the discretionary allowance of these prerogative writs and made them proceedings of right, but it was also designed to abolish the many technical requirements and limitations on the use of these prerogative writs and to substitute in their place a proceeding based on equitable principles adapted to the needs of each particular case. The neat distinctions between the several former prerogative writs have no more meaning today than the distinctions that once existed between trover and trespass among the ·forms of action of an earlier day, or between bills of interpleader and bills in the nature of a bill of interpleader among the equitable remedies of yesterday. These matters are no mere formalities. They go to the very heart of an adequate remedy. The former prerogative writs, like the former forms of action, were encumbered by many technical limitations as distinguished from equitable proceedings which developed later in the story of law and were governed by principles far more flexible and adaptable to individual cases. It is quite as important to the usefulness of proceedings in lieu of prerogative writs that they proceed on equitable principles and be governed by the flexibility of equitable rules as it is that they issue as of right free from the former restrictions of judicial interventions. As was said in *Ward v. Keenan*, 3 *N. J.* 298, 308–309 (1949):

"Our problem is, therefore, by rules of court and judicial decisions, to preserve as far as may be the substantive law of the former prerogative writs as a means of safeguarding individual rights against public officials and governmental bodies, while at the same time avoiding the defects of procedure that led to criticism. * * *

In determining what course to pursue under the new practice in this field we should look to the decisions on the old procedure on prerogative writs, not as controlling authorities but for what light they may throw on the instant problem of presenting sound rules of procedure. Much light may also be gained from examining the practice in analogous cases of equitable procedure, for it is becoming increasingly clear, now that discretion in granting of the writ has been abolished, that the procedural principles applicable in the two fields are in many respects identical."

Such actions, although administered in the Law Division of the Superior Court because their predecessor writs originated there, concededly proceed on equitable principles which are as much within the power of the Law Division to apply as it is for the Chancery Division to apply the principles of common law. To hold otherwise would be to unduly restrict, and without serving any purpose whatsoever, the usefulness of proceedings in lieu of prerogative writ.

Here the power of the court to impose, if necessary, restrictions on the amount of tax funds that may be raised under this judgment in the period of transition, is clear. The power of equity to prevent accident and mistake is fundamental. It took so long to free proceedings in lieu of prerogative writ from the technicalities of the former prerogative writs that any return to this outmoded learning would be deprecated.

## IV.

### CONCLUSION

The majority says the "dominant principle of the new constitutional mandate is equality of treatment and burden" and that the standard of true value, "the peremptory statutory assessment criterion," is "but a means of realizing uniformity and equality." But the new constitutional mandate has not yet been implemented by the Legislature and

632

we have no way of knowing whether or not it ever will be. The attempt to amend the Constitution of last year certainly does not lead us to any conviction that the Legislature is intending the adoption of any statutes implementing the taxing provision of the 1947 Constitution. We are merely called upon to enforce the statutory standard of assessment at true value. That being so, how can a determination of the matter before us which in itself ignores that "peremptory statutory assessment criterion" of true value and suspends for two—or according to the concurring opinion three—tax years the application of the principle of equality of treatment and burden and delays the assessment of property at true value, be said to be the one demanded by the equities of the case?

Professor James C. Bonbright, of Columbia University, in his work *"The Valuation of Property," volume* I, *pages* 497, 498, says:

"Theoretically the taxpayer's pocket is not in the least affected by uniform undervaluation or overvaluation. Systematic undervaluation diminishes the tax base, and the rate must therefore rise in order to supply the required government revenue. * * * The objections to the practice of undervaluation are patent. In the first place, except where sanctioned by statute, it involves a generally known and sanctioned disregard by officials of the law requiring them to assess property at its full and fair value. The other great vice is that the percentage of undervaluation is rarely a matter of common knowledge, so that it is extremely difficult to ascertain whether there is uniformity in the proportion or whether, through incompetence, favoritism, or corruption of the assessors, some portions of the taxing body are bearing the others' burdens, as between either individuals or local groups."

Equity will never condone disrespect for the law, for equity follows the law. Equality of treatment and burden is equity; to delay equity is to deny equity.

The majority opinion calls for delaying compliance with the mandate of the statutes until the tax year 1959 so as to afford "the Legislature the opportunity to take such measures and provide for such administrative procedures as its own inquiry may prove to be essential to the public interest, and to allow the Township time needed for the

fulfillment of the project." This court has no right to withhold judgment on statutes which date back to 1875 to give "the Legislature the opportunity to take such measures and provide for such administrative procedures as its own inquiry may prove to be essential to the public interest, and to allow the Township time needed for the fulfillment of the project" at the expense of the plaintiff and other similarly situated taxpayers. The township, on the other hand, does not need and does not ask for time for "its project." Its reassessment is finished; the time for decision has arrived.

The concurring opinion would give our citizens a "decent opportunity to seek an orderly solution * * * through their elected representatives or by constitutional amendment." But the problem is not a new one. It has long been with us. In one phase or another it has been before this Court for years, beginning with the *Baldwin* case in 1954. Without legislative direction over a hundred municipalities have undertaken a program looking forward to the carrying out of the mandate of the statutes, but they have never given a hint that they intend to comply with the law voluntarily. On the contrary, after arriving at true value they have, with the exception of Princeton Township, arbitrarily fixed a percentage of true value for assessment purposes. The courts have given adequate notice of the requirements of the law and have pointed out the wholesale disregard of it, and still compliance has lagged. In spite of all of this the Legislature has not changed the law, if indeed changes can be made which will improve the laws based on the sound principle of assessment at true value. We must, therefore, apply the law as we find it and not indulge in excuses not even presented to us.

The question before us is whether we will recognize the clear and unmistakable mandate of the statutes for assessment at true value and direct performance of the solemn duty of the defendants to assess at true value or ignore it and make ourselves a party to the positive disregard of the statutes. Any such weakness on the part of the court in

enforcing what is clearly the law can lead only to disrespect of its judgment. On the other hand, by insisting on adherence to the standard of true value, we effectuate the purpose and policy of the existing law, extinguish the evils that have grown up from the acceptance of a percentage of true value as an adequate standard of value and make policing of abuses infinitely easier, in the interest of realizing equality of treatment and burden.

I would affirm the judgment below for the reasons expressed herein.

Mr. Justice Jacobs has authorized me to say that he joins me in this dissent.

JACOBS, J. (dissenting). I would affirm for the compelling reasons set forth in the opinion of Judge Francis below. See *Switz v. Middletown Tp.*, 40 *N. J. Super.* 217 (*App. Div.* 1956). The statutory direction for assessment at true value is unequivocal and long-standing. When duly called upon in an appropriate legal proceeding, our solemn judicial responsibility to insure fair fulfillment of the legislative mandate is entirely clear. To meet practical necessities, the Appellate Division granted a deferment of the effective date of the original order and the record suggests no just need for additional delay in this thoroughly litigated case before us; if perchance any such need should appear, application by the township and its assessor for reasonable relief may readily be entertained by the Appellate Division.

WEINTRAUB, J., concurring in result.

*For modification*—Justices HEHER, OLIPHANT, BURLING and WEINTRAUB—4.

*For affirmance*—Chief Justice VANDERBILT, and Justice JACOBS—2.

*For reversal*—Justice WACHENFELD—1.